**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Derick BENNETT a/k/a Jamaican Derick, Defendant–Appellant.**

No. 90–3261.

United States Court of Appeals, Eleventh Circuit.

April 25, 1991.

Wm. J. Sheppard, Matthew P. Farmer, Sheppard & White, Jacksonville, Fla., for defendant-appellant.

Mark B. Devereaux, Asst. U.S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before FAY and JOHNSON, Circuit Judges, and PECK *, Senior Circuit Judge.

---

* Honorable John W. Peck, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

JOHNSON, Circuit Judge:

Derick Bennett appeals his conviction on charges of cocaine distribution and retaliation against a government informant.

## I. BACKGROUND OF THE CASE

In the spring of 1989, Derick Bennett was involved in cocaine distribution in Jacksonville, Florida. He gave some crack cocaine to a friend named Carolyn Taylor. Taylor then took the drugs to Alexander Gardner and asked him to sell the drugs for her. Gardner, however, was a government informant. Working with law enforcement officers, Gardner gathered information on Taylor, Bennett, and others.

In the fall of 1989, after finding out that Gardner was an informant, Bennett approached Gardner on the street and got into an argument with him. Bennett shot at Gardner, but did not hit him.

Bennett was subsequently indicted on charges of retaliating against a confidential government informant in violation of 18 U.S.C.A. § 1513(a)(2) and distributing five grams or more of cocaine in violation of 21 U.S.C.A. § 841(a)(1). He was convicted on both charges in a three-day jury trial in January 1990 and was later sentenced to serve nineteen years and seven months.

In this appeal, Bennett raises issues regarding the government's use of peremptory strikes in the selection of his jury, the district court's denial of his motion to interview prospective government witnesses, and the district court's grant of the government's motion in limine restricting testimony regarding a government witness's drug-related arrests. Bennett also appeals the district court's application of the sentencing guidelines.

## II. ANALYSIS

### A. *Batson* Claim

Bennett is a Jamaican-born African–American. His jury was chosen from a venire consisting of thirty-two persons, five of whom were African–Americans. Of its six peremptory strikes, the government used three to strike African–Americans. The empaneled jury contained two African–Americans. After each government strike against an African–American, Bennett objected to the strike as racially discriminatory in accordance with *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The district court requested that the government explain its reasons for striking the prospective jurors. In each instance, the court accepted the government's articulated reasons as racially neutral. Bennett asserts on appeal that the government's reasons were not racially neutral, but instead were pretextual.[1]

The government contends, therefore, that any right to a rebuttal was waived because Bennett did not object to having an inadequate opportunity to rebut the government's reasons as pretextual at the time the court made its findings. Bennett's response to the government's position at oral argument was that he objected to the court's *Batson* ruling in his post-trial motion for a new trial and that this objection was sufficient to allow this Court to address on appeal his lack of opportunity to rebut the government's reasons as pretextual.

*Batson* did not establish every detail of the procedure to be followed when the defendant makes an objection to the government's use of strikes, but instead left the formulation of many of the specifics to the courts. *Batson*, 476 U.S. at 99 & n. 24, 106 S.Ct. at 1724 & n. 24. *Gordon* and *Alston*, however, have since clearly required the district courts to give defendants some opportunity to show that the government's articulated reasons were pretextual, at least when the defendant asserts that they are pretextual. The issue of whether the defendant must formally

---

1. Bennett secondarily argues that the district court did not give him an opportunity to rebut the government's reasons for striking the prospective jurors in question before it declared the reasons to be racially neutral. In *United States v. Gordon*, 817 F.2d 1538 (11th Cir.1987), this Court found that a district court had erred because after the government had voluntarily explained its strikes "the district court failed to make any independent inquiry or allow [the defendant] the opportunity to offer rebuttal evidence pertaining to the Government's reasons." *Id.* at 1541. Moreover, in *United States v. Alston*, 895 F.2d 1362 (11th Cir.1990), this Court stated that after the government has offered its explanation, and the defendant raises the allegation that the government's reasons are pretextual, "the district court must allow the defendant to establish those facts." *Id.* at 1374 (Hatchett, J., concurring). In the instant case, however, the defendant's attorney did not allege that the government's explanation was pretextual at the time the government made its explanation for the strikes.

■ Once the defendant makes out a prima facie case of racial discrimination, "the burden shifts to the prosecutor to articulate a clear, reasonably specific and neutral explanation for challenging the black jurors." *United States v. David,* 844 F.2d 767, 769 (11th Cir.1988). We review the district court's findings of fact as to whether the government's articulated reasons are racially neutral on a clearly erroneous standard. *Id.* In making its determination, the district court may "consider whether the reasons offered by the government for excluding a black member of the venire also applied to white members." *United States v. Alston,* 895 F.2d 1362, 1367 n. 5 (11th Cir.1990). Bennett's primary argument is that the district court was clearly erroneous in holding the government's reasons racially neutral because white venire members were selected who had the same characteristics for which the African–American venire members were allegedly struck.

The first African–American the government struck was prospective juror Hunt, a nineteen-year-old, single male, who worked as a custodian and who had a relative working in law enforcement. The government's reasons for striking him were his youthfulness, lack of employment experience, and also the fact that he had an uncle who had been convicted on drug charges. The court found this last reason for striking Hunt especially persuasive. Bennett points out, however, that prospective juror Grandstaff, who was white and was not stricken, was also young, inexperienced, and lacked employment history. Moreover, yet another prospective juror, who cannot be identified in the transcript, also had a close family member who had been convicted of drug offenses, but he or she was not stricken.

Prospective juror Grier, the second African–American whom the government struck, was thirty-eight years old, was employed at a Naval Air Base, had been in the military, and had relatives in law enforcement. The prosecutor's articulated reason for striking him was that his ex-wife had been convicted of narcotics possession within the last year. Bennett again points out that the unidentified prospective juror with a close relative who had likewise been convicted of drug charges was not stricken. Moreover, he points out that those with ties to law enforcement and the military are generally good jurors for the government.

The last African–American the government struck was prospective juror Thomas. When the judge asked the venire generally whether any of them had eaten at the "Pepper Pot," a restaurant where Bennett had worked, Thomas said "no" along with everyone else. However, he later told a marshal during a break that he had heard of the "Pepper Pot" and knew it had a "bad reputation." The government asserted his belated admission of knowledge of the "Pepper Pot" and the fact that he lived near the restaurant as its reasons for striking Thomas. Bennett contends that these reasons are irrational because any venire member who knew of the "Pepper Pot" would be likely to be prejudiced against Bennett and therefore be a pro-government juror.

■ The fact that a prospective juror has "prior family involvement with drug charges," as was the case with Hunt and Grier, has been deemed a racially neutral reason for the government to strike under *Batson.* *Alston,* 895 F.2d at 1367. Though the unidentified prospective juror with this characteristic was not stricken, the record does not reflect this prospective juror's race or whether this prospective

demand an opportunity for rebuttal and the district court formally deny that opportunity in order for error to occur has not specifically been addressed by our Circuit. *But see United States v. Rodriguez,* 917 F.2d 1286, 1288, n. 4 (11th Cir.1990) (suggesting generally that all *Batson* claims must be raised before the jury is sworn); *United States v. Rudas,* 905 F.2d 38, 41 (2d Cir.1990) (stating that "[o]nce the Govern-

ment has offered reasons for its peremptory challenges, defense counsel must expressly indicate an intention to pursue the *Batson* claim"). We hold *infra,* however, that the government's articulated reasons are not pretextual as a matter of law. Opportunity to rebut the government's reasons would therefore have been to no avail. Consequently, we need not address Bennett's secondary argument at this juncture.

juror was eventually empaneled.[2] Therefore, the comparison between the unidentified non-stricken prospective juror and the stricken African–American venire members does not nullify the government's purported reason for striking. Moreover, "[t]he attributes relied upon by the prosecutor in striking potential jurors are not always easily compared ... and often require an evaluation of the degree to which the prospective juror manifests the stated attribute.... The trial judge is in a superior position to determine whether white members of the venire who were not struck had a greater, lesser, or the same degree of difficulty in following voir dire questions, or whether a prospective white juror's familiarity with a family drug problem was as significant as that of an excluded black member of the venire." *Id.* at 1367 n. 5. We must therefore defer to the judgment of the trial court.

 Bennett further claims, however, that the government's reasons for striking Grier and Thomas are irrational and therefore must be pretextual. *See United States v. Alcantar*, 897 F.2d 436, 438 (9th Cir.1990) (stating that "claims about the juror, although true, [may be] so irrational as a reason for striking a juror that they might be pretexts for some undisclosed discriminatory reason"). Bennett claims the reasons are pretexts because Grier's familial association with law enforcement makes him a strong pro-government juror and Thomas's knowledge of the "Pepper Pot" should actually prejudice him against Ben-

nett. These reasons in favor of the government's choosing these prospective jurors, however, must be weighed against the government's articulated reasons for striking them. In Grier's case, that articulated reason is his familial association with someone convicted on drug charges, clearly a weighty and racially neutral reason under *Alston, supra.* In Thomas's case, the government's reason for striking him was his belated admission that he knew of the "Pepper Pot" and that he lived in the area of the restaurant.[3] Though the sufficiency of these reasons for striking Thomas is not as apparent at first glance as the sufficiency of the reason for striking Grier, a close look at the record aids us in determining that they are. *See Alston*, 895 F.2d at 1367 n. 5 (noting that the weighing and comparisons a *Batson* claim requires also necessitate a close reading of the hearing transcript).

From the government's explanation regarding the striking of Thomas, the court appears to have assumed that the government's real reason was that the prospective juror lacked forthrightness. This lack of forthrightness was in the court's mind a sufficiently neutral reason justifying the strike. The court noted that Thomas's comments to the marshal would just as easily have supported a strike by the defendant.[4]

There is, however, some question as to whether Thomas actually lacked forthrightness. The government had requested as one of its four proposed voir dire questions

---

**2.** Under the method of jury selection used by the court, venire members were first struck, and then the twelve with the lowest juror numbers were seated along with two alternates. In Bennett's case, there were two persons left on the venire who were neither struck nor empaneled.

**3.** GOVERNMENT: Your Honor, the difficulty here, the United States didn't intend to strike this man until while you were on the phone or during our last break, the United States and the defense, we were both informed that a juror, or at least a prospective juror, had contacted one of our Marshals and explained to the Marshal that he would, although he had not eaten at the Pepper Pot, was well aware of the Pepper Pot's reputation and the reputation apparently of the surrounding neighborhood, if I'm repeating at least probably third time

hearsay what I was advised along with the defendant's counsel. Additionally, he resided in that area, as well.
(R4:87–88)

**4.** THE COURT: The Court would, first of all, find that the juror was asked if he knew anything about the restaurant, and he stated along with the rest of the jurors that he didn't, and that that would certainly give rise to a racially neutral reason for excluding him.
 The Court would also make the observation that probably his comments to the Marshal would support a peremptory challenge on behalf of the defendant, as much as on behalf of the Government, which would further support the racially neutral decision.
(R4:88).

whether the jurors had eaten at or knew of the "Pepper Pot." [5] The court, however, asking the question at the close of voir dire, asked only whether they had eaten at the "Pepper Pot." [6] Thomas stated along with the other prospective jurors that he had not eaten there. Later, he relayed to the marshal only that he knew of the restaurant's reputation and lived near it even though he had never eaten there.[7] Therefore, Thomas was actually truthful in answering the court's question and fastidiously forthright in relaying his doubts to the marshal. It is obvious that the court was not aware that it had asked in voir dire only whether any member of the venire had eaten at the "Pepper Pot" and had not asked the second half of the question concerning familiarity with the "Pepper Pot." Accordingly, the court was incorrect in finding that the government's reason for striking Thomas was his lack of forthrightness and consequently in declaring that this lack of forthrightness was a sufficiently neutral reason for the strike.

■ The court's misperception of the situation, however, was harmless. The government also put forward the additional reason for striking Thomas that "he lived in the area" of the restaurant. This additional reason is, in our opinion, sufficiently neutral to justify the strike. *See United States v. McAnderson*, 914 F.2d 934, 942 (7th Cir.1990); *United States v. Davis*, 871 F.2d 71, 72–73 (8th Cir.1989); *United States v. Andrade*, 788 F.2d 521, 525 (8th Cir.), *cert. denied*, 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 408 (1986). We therefore find no *Batson* error.[8]

### B. *Motion to Interview Witnesses*

■ Prior to trial, Bennett made a motion before the magistrate to interview prospective government witnesses. The government responded that its two witnesses, Alexander Gardner and Carolyn Taylor, had stated that they did not wish to speak to Bennett's attorneys. The magistrate, consequently, denied Bennett's motion. Bennett claims that this denial was error.

"It is well established that a defendant is normally entitled, without governmental interference, to access to prospective witnesses." *United States v. Pepe*, 747 F.2d 632, 654 (11th Cir.1984). However, "the government [has] no duty, absent a court order, to present its witnesses for interviews; the government's duty [is], simply, not to deny access." *Id.* at 655. Clearly, "a witness may refuse to be interviewed."

---

5. "3. Do any of you know of or have any of you eaten at the 'Pepper Pot' restaurant here in Jacksonville?" (R1:72:1).

6. THE COURT: If counsel would approach sidebar. I just looked down and I saw a question. Have any of you ever eaten at the Pepper Pot Restaurant in Jacksonville?
 PROSPECTIVE JURORS: No.
 A JUROR: Is it good?
 THE COURT: I don't know. Thank you. (R4:78–79).

7. THE COURT: Which Marshal did he approach?
 THE MARSHAL: Me, Your Honor.
 THE COURT: And, why don't you state your name and your position and tell me what he said to you.
 THE MARSHAL: Yes, ma'am. My name is Stanley Clay, Deputy United States Marshal. I was standing at the door, Your Honor. As he was passing out he asked me was I security, I said I was a Marshal. He said, maybe one item I should have brought up, but I do live in the area, but I do not eat at the Pepper Pot, it has a bad reputation. I told him to hold up at the break, that I would report it to Mr., the Clerk of the Court, Your Honor. (R4:88).

8. Generally speaking, "when a petit jury has been selected upon improper criteria," the Supreme Court has "required reversal of the conviction because the effect of the violation cannot be ascertained." *Vasquez v. Hillery*, 474 U.S. 254, 268, 106 S.Ct. 617, 626, 88 L.Ed.2d 598 (1986). "[D]iscrimination in [jury selection] undermines the structural integrity of the criminal tribunal itself and is not amenable to harmless error review." *Id.* at 263–64, 106 S.Ct. at 623–24. Nevertheless, it is also clear that a "reviewing court [must] consider the trial record as a whole and ... ignore errors that are harmless, including most constitutional violations." *United States v. Hasting*, 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). In the case at bar, there can be no finding of discrimination because one of the government's articulated reasons for striking was, in fact, legitimate. In such a case as this, where discrimination cannot be said to have infected the jury, it is incumbent upon us to disregard errors which cannot ultimately affect the outcome of the case.

**1554**

*United States v. Brown,* 555 F.2d 407, 425 (5th Cir.1977) (quoting *United States v. Dryden,* 423 F.2d 1175, 1177 n. 6 (5th Cir. 1970)), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). "[A] government witness who does not wish to speak to or be interviewed by the defense prior to trial may not be required to do so." *United States v. Benson,* 495 F.2d 475, 479 (5th Cir.), *cert. denied,* 419 U.S. 1035, 95 S.Ct. 519, 42 L.Ed.2d 310 (1974).

Bennett proposes that the court should have ordered or at least encouraged Gardner and Taylor to talk with his attorney. In *Pepe, supra,* the district court did take it upon itself to advise the government's witness that he was free to speak with the defense if he chose to do so. *Pepe,* 747 F.2d at 656. *Pepe* did not, however, create or impose a duty on the district court to encourage reluctant government witnesses to speak with defense counsel. Rather, error is normally found only where "prosecutors have hidden witnesses or deliberately disobeyed court orders to produce for examination witnesses under governmental control." *Pepe,* 747 F.2d at 654. This is not such a case. We therefore find this argument to be without merit.

### C. *The Motion in Limine*

■ Prior to trial, the government made a motion in limine to limit Bennett's cross-examination of witness Gardner in regard to prior drug arrests and a murder arrest, all of which were dismissed against him. After holding an evidentiary hearing, the district court found that the drug arrests in question had been staged in order to maintain Gardner's cover and ruled that Bennett could not bring up the drug arrests because of the possibility that their mention would mislead the jury. The court ruled, however, that Bennett could cross-examine Gardner as to the murder arrest because, in Bennett's theory, the dropping of the murder charge was related to Gardner's willingness to cooperate with the government. Bennett appeals the court's limitation of his cross-examination as to the drug charges.

■ This Court reviews the district court's "curtailment of cross-examination or the admissibility of extrinsic evidence to attack the credibility of a witness" under the "abuse of discretion" standard. *United States v. Calle,* 822 F.2d 1016, 1019–20 (11th Cir.1987). The defendant's right to cross-examine the government's witnesses is secured by the Sixth Amendment guarantee that the accused shall enjoy the right to be confronted with the witnesses against him. *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1109, 39 L.Ed.2d 347 (1974). "[E]xposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316–17, 94 S.Ct. at 1110–11. Bennett claims that the real rationale for dropping the drug charges was that the government made a deal with Gardner in order to get him to testify against Bennett. Accordingly, Bennett claims, cross-examination in regard to the charges could have uncovered Gardner's bias against Bennett.

■ "This court has repeatedly held, however, that a trial judge may limit cross-examination without infringing the defendant's sixth amendment rights where '(1) the jury, through the cross-examination permitted, was exposed to facts sufficient for it to draw inferences relating to the reliability of the witness; and, (2) the cross-examination conducted by defense counsel enabled him to make a record from which he could argue why the witness might have been biased.'" *Calle,* 822 F.2d at 1020 (quoting *United States v. Summers,* 598 F.2d 450, 461 (5th Cir.1979)). The government points out that Gardner was cross-examined on, *inter alia,* his prior involvement in drug distribution for a large-scale drug organization, his plea agreement with the government which limited his criminal liability, and his undercover work for the government. Consequently, the jury had information upon which to judge Gardner's reliability, and defense counsel had a record from which to argue bias. Accordingly, limitation of Gardner's cross-exami-

nation was within the district court's discretion.[9]

### D. *Sentencing Issues*

After trial, a pre-sentencing report was done. The district court adopted that report's recommendations and arrived at a sentence of nineteen years and seven months. The report calculated that the offense level for distributing cocaine in violation of 21 U.S.C.A. § 841(a)(1) in Bennett's case was 32. The report then suggested adding 2 points for possession of a weapon during the commission of a drug offense under § 2D1.1(b)(1) and 2 points for obstruction of justice under § 3C1.1 for a suggested level of 36.

The count of retaliation against a government informant in violation of 18 U.S.C.A. § 1513(a)(2) was grouped together with the drug offense as a closely-related offense pursuant to § 3D1.2(c) which requires grouping when one of the counts embodies conduct that is treated as a specific offense characteristic in, or adjustment to, the guideline applicable to another count. The shooting at Gardner was the basis of the obstruction of justice adjustment on the drug distribution charge. Therefore, Bennett's offense level was not additionally increased for the retaliation charge. Bennett's motion for a two-point downward adjustment for acceptance of responsibility

under § 3E1.1(a) was denied. The sentencing level finally arrived upon therefore remained 36.

#### (1) The Relevant Conduct Enhancement

■ The base level for distribution of five grams or more is normally 26, instead of the level 32 used in Bennett's case. The base level was adjusted upward 6 points under § 1B1.3(a)(1), which allows the sentencing court to take into account "relevant conduct," defined as "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction." Bennett was convicted of distributing five or more grams of cocaine. The chemist who analyzed the cocaine Bennett distributed to Taylor stated that she weighed 11.9 grams of cocaine base. Taylor, however, testified at trial that Bennett had in his apartment 362 packets of cocaine base on the night that Bennett gave her the cocaine which she later passed on to Gardner. Taylor also testified that the bag of cocaine she passed to Gardner contained 62 packets. The Presentencing Investigation Report projected the total amount of cocaine Bennett had in his possession that night to have been 90 grams.[10]

---

**9.** Bennett also asserts that the trial court erred in an evidentiary ruling which he feels eventually resulted in a further limitation on his ability to cross-examine Gardner. Stephanie Roberts, one of Bennett's witnesses, had testified that it was Gardner, rather than Bennett, who initiated the exchange of gunfire on the street when Bennett and Gardner fought about Gardner's involvement as a government informant. During the direct examination of Roberts, Bennett asked, "Did [Gardner] say anything about the shooting at that time to either you or Ms. Grant?" The government objected to the question as calling for hearsay. At sidebar, Bennett argued that this was an exception to the hearsay rule in that he wished to show based on Roberts' testimony that Gardner had actually initiated the gunfire and had planned to make it appear that he had fired at Bennett in self-defense. The court permitted Bennett to ask the question, but cautioned that the government would also be permitted to go into the issue on rebuttal. Bennett then felt compelled to forgo the question because the government would bring up testimony regarding Gardner's fears at

the time and his practice of staying in hotel rooms, apparently afraid of being found by those against whom he had informed. Bennett appears to claim that the court's ruling amounted to a Sixth Amendment violation because he was inhibited from asking Roberts a question on direct which would have thrown doubt on Gardner's credibility and could have bolstered his theory that he fired at Gardner only in self-defense. Bennett equates this inhibition in examining Roberts with a limitation on his cross-examination of Gardner because both resulted in restraint on his ability to discredit Gardner's testimony. Bennett cites no case law to support this convoluted theory, nor can we uncover any. We cannot see that his theory implicates a restraint on the Sixth Amendment right to cross-examination.

**10.** However, 11.9 grams/62 packets × 362 packets does not equal 90 grams. Rather, 11.9 grams/62 packets × 362 = 69.48. The Presentencing Investigation Report does not explain where the figure of 90 grams comes from. It is

Bennett claims that an amount of cocaine base greater than 11.9 grams was not shown by a preponderance of the evidence. Taylor presented the only testimony indicating that the drugs involved were more than the 11.9 grams confirmed by the chemist. Bennett points out that the chemist testified that there were 92 packets in the bag she was given to examine, *i.e.*, the bag Bennett gave Taylor which was later passed on to Gardner. The chemist removed 30 packets and tested them, so that at the time of trial there were only 62 packets actually remaining in the bag. But Taylor testified at trial that there were 62 packets in the bag when Bennett originally gave it to her, suggesting in Bennett's view, that she had no independent recollection of the number but was basing her testimony on her examination of the bag after the chemist had finished the testing, *i.e.*, 92 − 30 = 62. Bennett also asserts that Taylor's inaccuracy throws serious doubt on the reliability of her testimony regarding the total number of packets Bennett had in his possession that night. The district court, however, found Taylor's testimony credible, stating that it had been specific and that the jury had obviously found her credible.

■ "[C]onduct not contained in the indictment may be considered at sentencing." *United States v. Ignancio Munio,* 909 F.2d 436, 439 (11th Cir.1990) (per curiam). This concept applies even when considering the amount of drugs under the "relevant conduct" provision of the Guidelines. *Id.* at 438–39. The facts considered in sentencing, moreover, need only be proven by a preponderance of the evidence. *Id.* at 439. In addition, "[t]he sentencing court's findings of fact must be accepted unless they

are 'clearly erroneous.'" *United States v. Erves,* 880 F.2d 376, 381 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 416, 107 L.Ed.2d 381 (1989). It is also clear that "the court of appeals must 'give due regard to the opportunity of the district court to judge the credibility of witnesses ... and shall give due deference to the district court's application of the guidelines to the facts.'" *United States v. Howard,* 923 F.2d 1500, 1503 (11th Cir.1991) (quoting 18 U.S.C. § 3742(e)(4) (1988)). The district court, having listened to all of the testimony, chose to accept Taylor's testimony as to the total amount of cocaine Bennett had in his possession. We cannot find error in that credibility choice absent a stronger showing than Bennett has put forward here.

**(2) Upward Adjustment For Firearm**

■ The district court adjusted Bennett's base level upward two points by applying § 2D1.1(b)(1), which states, "If a dangerous weapon (including a firearm) was possessed during commission of the offense, increase by 2 levels." The court stated: "The court would find from the facts of this case that the weapon was conveniently near the defendant in order for him to obtain it to consummate the drug transaction, and would find that it was used, therefore, for the offense and he possessed the weapon in furtherance of the offense; and the Court would deny the objection." (R8:9).

However, as the government concedes, there was absolutely no evidence presented at trial indicating that Bennett possessed a firearm at the time of the drug offense for which he was convicted. The only evidence of firearm possession involved the offense

---

possible that the figure is based on a statement given by Taylor at trial. On direct examination, Taylor explained the process by which she and Bennett made the cocaine into crack.

Q. And what process—what was being made? What was being cooked?

A. Crack cocaine. He told me to cut it—he started it so I know what size to cut it, and then I started cutting it.

And then after I cut the first one he did two more like that. There was about 28.6 grams, it was like an ounce in each bag.

Q. Had you seen an ounce of cocaine before?

A. Yes, sir.

(R5:63–64)

By this, Taylor may have meant that there were three bags each weighing 28.6 grams. If so, there would have been approximately 90 grams of cocaine in the apartment that night: 3 bags × 28.6 grams = 85.8, or approximately 90 grams.

of retaliation against a government informant, *i.e.*, the fight with Gardner, which occurred seven months after the drug transaction.

Bennett contends that the district court erred in enhancing his offense level under this guideline. The guideline itself specifies that the possession must occur "during commission of the [drug] offense." Moreover, application note three to this section states that the purpose of the enhancement is to "reflect[ ] the increased danger of violence when drug traffickers possess weapons." The note goes on to say that the "adjustment should be applied if the weapon was present" during the offense. Moreover, in addressing this section, this Circuit has found the enhancement justified in situations in which there was sufficient evidence to support a finding that the firearm was actually present at a drug transaction. *United States v. Shuman*, 902 F.2d 873, 875 (11th Cir.1990). Accordingly, it would appear that the Guidelines did not contemplate use of this enhancement where the defendant possessed the firearm seven months after the drug transaction occurred.

The government argues that the enhancement should apply anyway because the altercation with Gardner during which Bennett possessed the gun was about Gardner's informing on drug transactions. The government contends that the firearm can be tied in through the relevant conduct section, § 1B1.3(a)(2), which allows the district court to take into account "all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." This argument ignores the fact that § 1B1.3 begins by stating, "Unless otherwise specified." The enhancement in § 2D1.1(b)(1) would appear to be the "otherwise specified" which precludes application of § 1B1.3 in this case. In addition, the government's argument does not comport with the purpose behind the enhancement, *i.e.*, to punish those who increase the danger of injury *during* commission of drug offenses. Consequently, Bennett is due resentencing without the firearm possession enhancement.

### (3) Acceptance of Responsibility

■ The district court refused to adjust Bennett's offense level downward 2 points for acceptance of responsibility under § 3E1.1(a). Bennett contends that this was error because he rendered "voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense," which is one of the reasons for which this reduction can be applied. *See* Application Note 1(e). Bennett points out that when arrested he was cooperative, allowed police to search his car, helped them open his trunk, and showed them where his gun was.

"Because demonstration of whether or not the defendant has personally accepted responsibility for his criminal conduct requires a consideration of both objective factors and subjective considerations of the defendant's demeanor and sincerity, the district court's determination will not be overturned unless it is without foundation." *United States v. Castillo–Valencia*, 917 F.2d 494, 500 (11th Cir.1990). It is clear that a court can recognize a defendant's cooperation with the government yet still deny the two-point reduction under this guideline. *Id.* The government contends that the district court's reason for not applying the guideline was that Bennett pled not guilty and went to trial denying any responsibility for the retaliation charge by claiming he acted in self-defense by firing the gun at Gardner. "[A] defendant's decision to go to trial may properly be considered along with other factors in determining whether there has been an acceptance of responsibility under 3E1.1." *Id.* at 501. With these considerations in mind, Bennett clearly has not presented sufficient cause to overturn the district court's decision not to apply § 3E1.1.

### (4) Relevant Conduct Provision Unconstitutional

■ Bennett finally argues that § 1B1.3, which allows the court to consider conduct other than that for which the defendant was indicted, is unconstitutional as

**1558**

a Bill of Attainder under Article 1, Section 9, Clause 3 of the United States Constitution. A bill of attainder is " 'a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.' " *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841, 846–47, 104 S.Ct. 3348, 3351–52, 82 L.Ed.2d 632 (1984) (quoting *Nixon v. Administration of Gen. Servs.*, 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed.2d 867 (1977)). Bennett argues that through the relevant conduct provision the legislative branch has taken discretion in sentencing away from the judicial branch, forcing the court to consider a quantity of drugs, in Bennett's case, other than that for which he was convicted of distributing.

Under this Court's precedent, however, Congress has the power to restrict judicial discretion. "Through the Sentencing Reform Act, Congress merely decided to exercise its power to fix sentences and tighten the rein on the broad judicial discretion it had previously delegated, which resulted in unacceptably wide sentencing disparities." *United States v. Harris*, 876 F.2d 1502, 1506 (11th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 417, 107 L.Ed.2d 382 (1989). Moreover, the consideration of all relevant conduct has been a traditional sentencing practice. *Alston*, 895 F.2d at 1372 ("The idea that a sentencing court may consider conduct not covered by the counts of conviction is neither new nor radical. Prior to the enactment of the Guidelines, sentencing courts relied upon such information in arriving at sentences."). Finally, the sentencing court does retain at least some discretion in deciding whether to apply the relevant conduct provision in that under § 6A1.3 the court has the authority to resolve factual disputes regarding any sentencing factor. Presumably, then, if the court does not find conduct outside of the conviction relevant or proven with sufficient accuracy, it need not consider that conduct in sentencing. Therefore, Bennett's argument on this point is without merit.

### III. CONCLUSION

We AFFIRM the district court on all issues except its upward adjustment of the sentence under § 2D1.1(b)(1). We REMAND for sentencing in accordance with this opinion.