UNITED STATES of America, Plaintiff–Appellee,

v.

Charles E. SHEFFIELD, Defendant–Appellant.

No. 92–8372.

United States Court of Appeals, Eleventh Circuit.

June 4, 1993.

Paul L. Cames, Warner Robins, GA, Jake Arbes, Atlanta, GA, for defendant-appellant.

Mirian Wansley Duke, Asst. U.S. Atty., and Dixie A. Morrow, Macon, GA, for plaintiff-appellee.

Before FAY, Circuit Judge, JOHNSON, Senior Circuit Judge, and MERHIGE *, Senior District Judge.

FAY, Circuit Judge:

The defendant, Charles E. Sheffield, was convicted of embezzling United States Air Force property, and conspiring to do the same, by ordering his subordinates at Robins Air Force Base to use government time and materials to manufacture fishing equipment for his personal use. Mr. Sheffield was sentenced to two years imprisonment, fined four thousand dollars, and ordered to pay restitution to the United States Air Force. Mr. Sheffield appeals his conviction, arguing that the trial judge (1) improperly prohibited him from impeaching an important government witness on cross-examination and through extrinsic evidence, and (2) improperly excluded evidence that the manufacture of fishing equipment could be a legitimate Air Force Base function. We agree that these evidentiary rulings were erroneous and prejudiced Mr. Sheffield's defense. Therefore, we reverse the conviction and remand for a new trial.

---

* Honorable Robert R. Merhige, Jr., Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

## FACTS

Before his incarceration, the defendant was an avid fisherman. He often fished recreationally, discussed fishing with his friends and co-workers, made his own fishing lures, and occasionally competed in fishing tournaments. When he was not fishing, defendant Sheffield worked as a civil servant at Robins Air Force Base in Warner Robins, Georgia. Mr. Sheffield was a Section Chief, supervising over 300 workers who manufactured equipment for Air Force use. In addition to Air Force equipment, occasionally these workers also made small retirement gifts for high-ranking military and civilian employees, such as plaques, flagholders, double-sided golf clubs, and on at least one occasion, fishing lure molds. These retirement gifts were legitimate projects, authorized through the chain of command at the Air Force Base. In fact, it was part of Mr. Sheffield's job to oversee the production of these gifts.

Mr. Sheffield's present troubles grew out of allegations that he used his supervisory authority at the Air Force Base to convert government property and employee labor to his own use. At his trial, the government alleged that Mr. Sheffield conspired with another supervisor at the Air Force Base, Jerry Norris,[1] to steal government property by having subordinates make fishing equipment for them on government time and using government materials. Apparently, the design and manufacture of fishing lures is a complicated business; the government produced witnesses who took part in all stages of production. Mr. Norris testified that the entire operation sprang out of conversations with Mr. Sheffield, during which the two men speculated regarding ways to improve on the time-consuming lure production method of hand craftsmanship. Another witness testified that he made a pulley at Mr. Norris' request, which he later saw incorporated into a fishing lure tying machine in Mr. Sheffield's office. A third witness testified that Mr. Sheffield ordered and supervised the design and construction of a fishing lure drying rack, which held freshly painted lures so that their separate parts did not stick together as the wet paint dried and became tacky.

Finally, several witnesses testified that they helped produce molds for fishing lure molds. These base employees testified that they made metal molds for Messrs. Sheffield and Norris. When a plastic mixture was poured into these metal molds, it solidified in the form of a "second generation" fishing lure mold, which then could be used to form the actual fishing lure. One witness in particular, Elzie David Singletary, claimed to have spent 400–500 hours and used almost one thousand dollars worth of government property making hundreds of molds. Mr. Singletary claimed that he did not know the mold production was unauthorized until Jackie Cleghorn, a high-ranking official and Mr. Sheffield's supervisor, discovered the molds. In his deposition, Mr. Singletary related that Mr. Cleghorn asked him, without anger, why he was making the molds. Upon being told that the molds were for Mr. Sheffield, Mr. Cleghorn immediately left and discussed the matter with Mr. Sheffield. After that conversation, Mr. Singletary claimed, Mr. Sheffield directed him to continue making the molds, but to hide them from Mr. Cleghorn.

At trial, Mr. Sheffield's attorney attempted to elicit this story from Mr. Singletary, so that he could impeach the witness with Mr. Cleghorn's contrary version of the encounter. However, the trial judge ruled the testimony irrelevant and prohibited both cross-examination of Mr. Singletary on this point and the impeachment testimony of Mr. Cleghorn. Mr. Cleghorn would have testified that when he discovered the fishing lure molds, he angrily demanded to know who was making them. Instead of telling Mr. Cleghorn that Mr. Sheffield had authorized the molds, Mr. Singletary responded, "I am [making them], boss." Mr. Cleghorn testified in his deposition that he "went ballistic," (Def.Exh. 34–4–5) but Mr. Singletary did not try to defuse his anger by telling him the molds were authorized; instead, he walked away, "kind of hanging his head down ... like he was caught." (Def.Exh. 34–5). Further, Mr. Cleghorn testified that he tried to reach Mr.

---

**1.** Before trial, Mr. Norris plead guilty to conspiring to steal government property. As part of his plea agreement, Mr. Norris testified against Mr. Sheffield.

Sheffield that day because he supervised Mr. Singletary, but that Mr. Sheffield was not at work.

Without this impeachment evidence, Mr. Sheffield defended against the government's charges by claiming that he himself made much of the fishing equipment seized by the government (such as various fishing lures and the lure tying machine) on his own time and with his own materials. Further, Mr. Sheffield claimed that when he asked the various government witnesses to construct fishing equipment for him, he never intended that they use government property or time. Instead, Mr. Sheffield testified that he assumed they would use materials they owned and equipment at a nearby vocational school or machine shop. Mr. Sheffield acknowledged that he had requested production of one set of fishing lure molds at the base, but claimed that those molds were a legitimate retirement gift project. Mr. Sheffield claimed that Mr. Singletary made any additional molds on his own initiative and for his own benefit. Finally, Mr. Sheffield testified that after Mr. Cleghorn notified him of Mr. Singletary's unauthorized molds, he directed Mr. Singletary to throw the molds away and refrain from producing any more.

Mr. Sheffield's defense was hampered by several rulings of the trial court. First, the court quashed the defense subpoena of Jackie Cleghorn, ruling that the defense could not impeach government witness Singletary with Mr. Cleghorn's contrary version of their encounter over the contraband fishing lure molds. The judge also prohibited cross-examination of Mr. Singletary on this point. In quashing the subpoena, the trial judge reasoned that witnesses may not be impeached with their prior failure to mention a fact to which they testify in court. In limiting cross-examination, the judge reasoned that the only other difference between Mr. Singletary's and Mr. Cleghorn's stories concerned the timing of Mr. Cleghorn's discussion with Mr. Sheffield, and that disagreement was immaterial.

In addition, at a hearing on the government's motion to quash subpoenas, the trial judge granted the government's oral motion in limine and prohibited the defense from

referring at trial to the accepted base custom of using government facilities to make retirement gifts. The defense argued that evidence of this custom was necessary to make plausible Mr. Sheffield's defense that the fishing lure molds he ordered were for a legitimate project. Otherwise, the jury surely would conclude that production of fishing lure molds fell outside the legitimate mission of a United States Air Force Base. However, the trial judge excluded the evidence as irrelevant, reasoning that the production of retirement gifts on previous occasions did not have any bearing on whether Mr. Sheffield ordered fishing equipment made for his personal use on the occasion charged.

### DISCUSSION

Mr. Sheffield appeals these evidentiary rulings of the trial court, claiming that they deprived him of evidence crucial to his defense. We review the "'curtailment of cross examination [and] the admissibility of evidence to attack the credibility of a witness' under the 'abuse of discretion' standard." *United States v. Bennett,* 928 F.2d 1548, 1554 (11th Cir.1991) (citation omitted). Similarly, we review the trial court's rulings on the relevance of evidence under the abuse of discretion standard. *United States v. Kelly,* 888 F.2d 732, 743 (11th Cir.1989). On this standard, we find error requiring reversal in both the exclusion of evidence impeaching Mr. Singletary, and in the exclusion of evidence of the base custom of making retirement gifts. We therefore reverse Mr. Sheffield's conviction and remand for a new trial.

*Impeachment by Prior Inconsistent Statement*

Although Mr. Singletary testified at trial that he made hundreds of fishing lure molds at Mr. Sheffield's direction, he may not have implicated Mr. Sheffield when the molds were first discovered. Mr. Cleghorn testified in his deposition that Mr. Singletary answered his angry demands by claiming responsibility for the molds, not by blaming Mr. Sheffield. Mr. Singletary's alleged failure to deflect Mr. Cleghorn's anger by saying that Mr. Sheffield had authorized the molds was inconsistent with his in-court iden-

tification of Mr. Sheffield as the architect of the entire lure mold production scheme. Evidence of this prior inconsistent silence should have been admitted for impeachment purposes.

"Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." *Jenkins v. Anderson*, 447 U.S. 231, 239, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980). This is because " 'a failure to assert a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact....' " *United States v. Leach*, 613 F.2d 1295, 1305 (5th Cir.1980) [2] (quoting 3A J. WIGMORE, EVIDENCE § 1042). *See also United States v. Stock*, 948 F.2d 1299, 1301 (D.C.Cir.1991). From Mr. Cleghorn's version of the lure mold encounter, it would have been natural for Mr. Singletary to mention Mr. Sheffield's name if Mr. Sheffield had ordered production of the molds. Mr. Cleghorn, a high-ranking base official, "went ballistic" upon seeing the molds and demanded an explanation. He had the authority, and the apparent inclination, to initiate disciplinary action against Mr. Singletary, or even fire him. If Mr. Singletary had not known that the molds were unauthorized, as he claims, it would have been natural to try to deflect Mr. Cleghorn's anger by saying his supervisor, Mr. Sheffield, had authorized the molds. Therefore, evidence of Mr. Singletary's prior failure to mention this point was inconsistent with his in-court testimony and admissible . as impeachment evidence.

■■■■ However, the trial judge excluded this evidence. The judge prohibited defense counsel from cross-examining Mr. Singletary about his prior response to Mr. Cleghorn, and he quashed the defense subpoena of Mr. Cleghorn, who would have provided extrinsic evidence on that point. With respect to limiting the cross-examination of Mr. Singletary, we note that the defendant's right to cross-examine government witnesses is secured by the Confrontation Clause of the Sixth Amendment. Investigation of a witness'

credibility through the exposure of his or her bias and motivation in testifying is part of this right. *Davis v. Alaska*, 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974). Therefore, the defendant must be allowed to cross-examine government witnesses sufficiently to allow the jury to adequately assess the witnesses' credibility. *United States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir.1992).

Mr. Singletary's alleged prior failure to implicate Mr. Sheffield when it would have been natural to do so was probative of Mr. Singletary's credibility. Evidence of a witness' prior inconsistent statement has long been recognized as proper impeachment because the inconsistency between the witness' prior statement and the in-court testimony casts doubt on the reliability of both statements. In addition, the prior inconsistent statement in this case raises questions regarding Mr. Singletary's motivation to testify. The specter of disciplinary action (and, as this case shows, criminal prosecution) hung over Mr. Singletary's head until he told base officials that Mr. Sheffield had ordered the production of the fishing lure molds. Therefore, evidence of Mr. Singletary's prior failure to implicate Mr. Sheffield raises the possibility that he testified against Mr. Sheffield to protect himself. It was error to prohibit cross-examination of Mr. Singletary regarding his prior failure to implicate Mr. Sheffield.

With respect to the exclusion of extrinsic evidence of Mr. Singletary's prior inconsistent statement, the government argues that the trial judge never actually quashed the subpoena of Mr. Cleghorn. The government contends that Mr. Cleghorn would have been allowed to testify, if only defense counsel had called him as a witness. It is true that the trial judge never said the words, "I quash the subpoena of Jackie Cleghorn. He may not testify at trial." However, the judge made it clear that he would exclude Mr. Cleghorn's testimony unless defense counsel convinced him otherwise. At the pre-trial conference, the judge opined that Mr. Singletary could not be impeached by his prior inconsistent

---

**2.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this circuit adopted as precedent all decisions of the former Fifth Circuit rendered before October 1, 1981.

failure to implicate Mr. Sheffield. In response to defense counsel's argument, the judge replied, "Tell you what, read the Rules of Evidence over the weekend, and I'll be glad to hear from you. I think you're off on the wrong track on that argument, to be honest with you, but we'll look at it." R2–11. At the hearing on the government's motion to quash subpoenas, the judge warned defense counsel not to use any of Mr. Cleghorn's deposition testimony at trial without first bringing it to the judge's attention. R3–11. Finally, at trial, the judge asked defense counsel if Mr. Cleghorn would be a witness. Defense counsel responded that Mr. Cleghorn was "on standby" and "if you decide that I can call him, I can call him." R4–149. After further discussion, the judge ruled that the inconsistency between Mr. Cleghorn's and Mr. Singletary's stories was immaterial and so prohibited reference to it at trial.

■ Thus it is clear that the trial judge excluded the extrinsic impeachment evidence that Mr. Cleghorn would have provided.[3] Defense counsel certainly was not free to call Mr. Cleghorn as a witness. We find this ruling to be an abuse of discretion. As discussed above, the inconsistency between Mr. Cleghorn's and Mr. Singletary's stories was material. For the same reasons that it would have been valid impeachment to cross-examine Mr. Singletary about his alleged prior inconsistent statement, it would have been valid impeachment to present Mr. Cleghorn's testimony as extrinsic evidence of the prior inconsistent statement. See *United States v. Winkle*, 587 F.2d 705, 710 (5th Cir.1979)[4] (After witnesses testified regarding conversations with the defendant, it was proper impeachment to allow the defendant to testify to his contrary versions of the conversations.). Evidence of the prior failure to implicate Mr. Sheffield could have raised

serious questions in jurors' minds regarding the credibility of Mr. Singletary, an important government witness. Therefore, the erroneous exclusion of this cross-examination and extrinsic evidence requires that Mr. Sheffield's conviction be reversed and this case remanded for a new trial.

*Evidence of Base Custom of Making Retirement Gifts*

■ The trial judge also erroneously excluded all evidence pertaining to the custom of using base facilities to produce authorized retirement gifts for high-ranking employees. However, there is some controversy over whether defense trial counsel preserved the issue for appeal by making an adequate proffer. For error to be predicated on a ruling excluding evidence, Federal Rule of Evidence 103(a)(2) requires that "the substance of the evidence was made known to the court by offer or was apparent from the context within which the questions were asked." FED. R.EVID. 103(a)(2). The purpose of this requirement is "to alert the [trial] court and opposing counsel to the thrust of the excluded evidence, enabling them to take appropriate action," and to construct a record appropriate for appellate review. *Parliament Ins. Co. v. Hanson*, 676 F.2d 1069, 1074 (5th Cir. Unit B 1982).[5]

■ Although defense trial counsel did not provide the court with affidavits or proffered testimony, he did make the substance of the retirement gift evidence known to the trial court. At the pre-trial conference, counsel explained the types of gifts made and that it was an accepted custom to use base facilities to make them. Defense counsel repeated this explanation at the hearing on the government's motion to quash subpoenas, immediately before the judge granted the government's motion in limine and prohibited all mention of this evidence at trial. Finally, on

**3.** On appeal, Mr. Sheffield argues that Jackie Cleghorn was a proper witness not only because of the impeachment evidence that he could provide, but also because he would testify that Mr. Singletary was a disgruntled employee who was biased against Mr. Sheffield, that Mr. Singletary could not have made all the molds he claims to have made without being discovered, and that Mr. Sheffield was a trusted employee of good character. Because defense counsel did not

raise these arguments before the trial court, we will not address them on appeal.

**4.** See *supra* note 2.

**5.** In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

direct examination, Mr. Sheffield began to discuss the base practice of making retirement gifts. The trial judge was sufficiently familiar with the substance of the evidence that he cut Mr. Sheffield's answer short and warned defense counsel at the bench not to stray into the prohibited territory. In sum, because the trial court and prosecutor were well aware of the substance of the evidence, and the record reflects the substance of the evidence, we find that the defense counsel made an adequate proffer. We therefore turn to the merits of the issue.

 The trial judge excluded this evidence as irrelevant, reasoning that the base practice of making authorized retirement gifts had no bearing on whether Mr. Sheffield ordered fishing lures made for his own benefit. We disagree. Evidence of the gift-making custom was relevant to Mr. Sheffield's state of mind when he ordered the production of fishing lure molds. It pertained to Mr. Sheffield's claim that the lure molds he ordered were for an authorized retirement gift, and that Mr. Singletary went beyond the scope of the project on his own initiative. The evidence substantiated this claim by showing that making fishing lure molds could be a legitimate project at the base, if they were for an authorized retirement gift. Without this evidence of the gift making custom, production of fishing lure molds on a U.S. Air Force Base must have seemed to the jury like the oddball project of a renegade fisherman.

In sum, this evidence was relevant because it had a tendency to make more probable Mr. Sheffield's claim that his request for fishing lure molds was part of a legitimate base project. *See* FED.R.EVID. 401. Evidence of the gift making custom was probative of the material question of Mr. Sheffield's intent, his state of mind, when he ordered production of the molds. *Compare Murphy v. City of Flagler Beach*, 761 F.2d 622 (11th Cir. 1985) (after police chief fired the plaintiff ex-police officer, assertedly for leaving the city limits while on duty, evidence that the chief and other officers regularly left the city limits while on duty was relevant to the chief's state of mind to show that reason was pretextual).

Moreover, by showing that this kind of project was not unheard of at the base, this retirement gift evidence certainly put a different light on Mr. Sheffield's actions. The evidence should have been admitted to put the charges against Mr. Sheffield in context, "to complete the story of the crime on trial." *United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir.1983). For the purpose of completing the story, this court has allowed the introduction of evidence of circumstances that were not part of the crime charged, even though the evidence was extremely prejudicial to the defendant. For example, evidence has been properly admitted to show a murder defendant's membership in a white supremacist prison gang, and the gang's creed and violent practices, to complete the story of the crime for the jury. *Id.* Similar evidence of a drug defendant's membership in the Outlaws Motorcycle Club was properly admitted because evidence of the Outlaws' way of life helped flesh out the story of the drug conspiracy charged. *United States v. Harrell*, 737 F.2d 971, 978 (11th Cir.1984). And evidence of a drug defendant's residence in prison and a halfway house was properly admitted to fully explain the crime charged, even though none of the accused criminal acts occurred in prison or the halfway house. *United States v. Champion*, 813 F.2d 1154, 1172 (11th Cir.1987).

Surely, if the danger of unfair prejudice or confusion of the issues did not substantially outweigh the value of completing the story for the jury in those cases, this defendant should be allowed to present the gift-making evidence to put his actions in context and substantiate his claim that the lure molds he requested were for a legitimate base project. It was error to exclude this relevant evidence, and that error was prejudicial enough to require the reversal of Mr. Sheffield's conviction and remand for a new trial.

### CONCLUSION

For the foregoing reasons, we REVERSE the defendant's conviction and REMAND for a new trial.

REVERSED and REMANDED.