**Mutulu SHAKUR, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Marilyn Buck, Petitioner,**

v.

**United States of America, Respondent.**

**Nos. 97 CIV. 2908 (CSH), 97 CIV. 3247 (CSH).**

United States District Court, S.D. New York.

Jan. 12, 1999.

---

**653**

*MEMORANDUM OPINION*
*AND ORDER*

HAIGHT, Senior District Judge.

Mutulu Shakur and Marilyn Jean Buck petition this Court, pursuant to 28 U.S.C. § 2255, for a writ of habeas corpus setting aside their prior conviction, and under Rule 33, Fed.R.Crim.P., for a new trial. Petitioners couple these demands with a request for an evidentiary hearing. The government resists Shakur's and Buck's petitions in their entirety and asks that they be dismissed without an evidentiary hearing.

## BACKGROUND

### Procedural History of the Case

In separate indictments returned by grand juries of this District, Shakur and Buck each were charged with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), participation in a racketeering enterprise, bank robbery, armed bank robbery, and bank robbery murder, in violation of 18 U.S.C. §§ 1961, 1962(d), 1962(c), 2113(a), 2113(d), 2113(e), and 2. The indictments were consolidated for trial.

On May 11, 1988, after a six-month trial, the jury convicted Shakur and Buck on all charges. Following unsuccessful post-trial motions, on August 2, 1988 this Court imposed prison sentences on both defendants. Shakur and Buck appealed from their convictions. The Second Circuit affirmed. 888 F.2d 234 (2d Cir.1989). The Supreme Court denied certiorari. 493 U.S. 1087, 110 S.Ct. 1152, 107 L.Ed.2d 1056 (1990).

On April 23, 1997, Shakur filed his present petition for habeas relief, under docket number 97 Civ. 2908. Buck filed her petition on May 5, 1997, under docket number 97 Civ. 3247. The petitions are for the most part based on the same grounds. This Opinion resolves both of them.

### Timeliness of the Petitions

Before considering the merits of these petitions, the Court raised *sua sponte* their timeliness, in light of the statute of limitations contained in the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), effective April 24, 1996. The parties

Jonathan W. Lubell, Morrison, Cohen, Singer & Weinstein, LLP, New York City, Michael Warren, Brooklyn, NY, for Petitioner Mutulu Shakur.

Jill Elijah, Flushing, NY, for Marilyn Buck.

Mary Jo White, United States Attorney for the Southern District of New York, White Plains, Elliott B. Jacobson, Esq., David Greenwald, Esq., Assistant United States Attorneys, Of Counsel, for the United States of America.

were directed to brief the issue, with particular reference to *Peterson v. Demskie*, 107 F.3d 92 (2d Cir.1997).

Counsel for petitioners contended that the petitions were not time barred by the AEDPA. The government contended that they were. However, the government conceded during oral argument on June 26, 1998, that the Second Circuit's subsequent decision in *Mickens v. United States*, 148 F.3d 145 (2d Cir.1998), resolved the timeliness issue under the AEDPA in petitioners' favor. Accordingly, I turn to the grounds upon which petitioners assert a right to habeas corpus relief.[1]

*The Grounds for the Petitions*

Shakur's petition, filed first, sets forth the asserted grounds for relief in detail. Buck's petition, with one exception, essentially echoes those grounds.

The Shakur petition originally asserted four grounds: (1) the government's failure to disclose to defendant evidence favorable to the defendant, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny; (2) the government's knowing use of perjured trial testimony to obtain defendant's conviction; (3) the government's deprivation of defendant's constitutional right to confront the principal witness against him; and (4) the obtaining of defendant's conviction "by use of evidence which was based upon unscientific, unreliable and improper examination, testing and conclusions at the Federal Bureau of Investigation ('FBI') Laboratory."

Buck's petition adopts these grounds, and adds the claim that the government's principal witness gave perjured testimony to the grand jury.

Shakur's fourth claim, challenging the quality of the scientific work performed by the FBI laboratory, has not been further pursued. That claim was based on an April 1997 report by the FBI Inspector General that was critical of the analyses performed by certain specialized sections of the agency's laboratory. At trial, an FBI laboratory em-

ployee gave fingerprint testimony with respect to Shakur. The government points out in its answering papers that the performance of the fingerprint section was not implicated by or criticized in the Inspector General's report. Shakur's briefs and affidavits say no more on the subject. The briefs for Buck are equally silent with respect to the FBI laboratory. I regard the claim as having been abandoned by both petitioners.

As will be seen, the petitioners' remaining claims all arise out of two written statements furnished to counsel for Shakur by an individual named Claude Strickland. I will consider the Strickland statements in detail. First, however, it will be necessary to place them within the context of the trial evidence elicited by the government and the defendants-petitioners.

*The Case for the Government*

The government's trial theory, which it proved to the jury's satisfaction, is summarized by the Second Circuit, 888 F.2d at 236:

> Shakur and Buck were participants in a group known as the "family", organized in mid–1970s to further its conception of the Black struggle in America. Although the "family's" goals were largely political, their means of attaining those goals were violently criminal. From December 1976 to October 1981, the "family" committed a succession of robberies and attempted robberies of armored trucks in the Northeast. Shakur was one of the leaders of a small circle of men who planned an executed the robberies, while Buck was a member of the so-called "secondary team", a group consisting mostly of women who assisted in the robberies by driving get-away cars, planning escape routes, and renting "safe houses". The "family's" final and most notorious crime, the "Brinks robbery" of October 20, 1981, resulted in the shooting deaths of a Brinks guard and two officers in Nanuet and Nyack, New York.

That summary may usefully be expanded by giving the dates of the several acts of

1. While conceding that these petitions at not barred by the AEDPA, the government presses the alternative argument that, under *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71

L.Ed.2d 816 (1982), "there is a procedural bar based on the failure to bring these claims at an earlier date." Tr. Oral Arg. at 3. I do not agree, for reasons stated *infra*.

violence charged against Shakur and Buck in the separate indictments against them.

The pattern of racketeering activity charged against Shakur included: the attempted armed robbery of an armored truck in Pittsburgh, Pennsylvania, on December 6, 1976; the kidnapping of two prison employees in the course of breaking inmate Joanne Chesimard, a/k/a/ "Cleo," a/k/a "Assata Shakur," out of the Clinton, New Jersey Correctional Facility on November 2, 1979; the armed robbery of approximately $521,000 from an armored truck in Inwood, New York, on April 22, 1980; three attempted armed robberies of an armored truck in Danbury, Connecticut, the last of which occurred on March 23, 1981; the robbery of approximately $292,000 from an armored truck in the Bronx, New York, on June 2, 1981, and the murder of an armored truck driver during the course of that armed robbery; three attempted armed robberies of an armored truck at the Chemical Bank in Nanuet, New York, from approximately the summer of 1980 through the spring of 1981; the armed robbery of approximately $1.6 million from an armored truck and the murder of an armored truck driver at a shopping mall in Nanuet, New York, on October 20, 1981, and the murders of two police officers during the course of the ensuing shoot-out with police in Nyack, New York, on the same day.

The pattern of racketeering activity charged against Buck included: the kidnapping of two prison employees in the course of the Chesimard prison break-out on November 2, 1979; the armed robbery of the armored truck in Inwood, New York, on April 22, 1981; the armed robbery of the armored truck in the Bronx, New York, and the murder of the armored truck driver, both occurring on June 2, 1981; and the armed robbery of an armored truck and the murder of the armored truck driver in Nanuet, New York, and the later murders of two police officers during the shoot-out in Nyack, New York, all occurring on October 20, 1981.

The principal fact witness for the government was Tyrone Rison. Rison, who had entered into a cooperation agreement with the government, testified that he was a member of the "family" and participated in most of the crimes charged in the indictments. The exceptions were the first of these, the December 6, 1976 attempted bank robbery in Pittsburgh (Rison had not yet joined the group), and the last, the Nanuet/Nyack episode (Rison having declined to participate in it). Rison gave evidence describing Shakur and Buck (who, he testified, joined the group in 1978) as participants in a number of crimes charged in the indictments.

*The Case for Shakur*

Shakur's defense had at its core the proposition that while his political goals were to further the fortunes of African–Americans, his means were peaceful and law-abiding, rather than violent and criminal. While Shakur did not testify in his defense, he called 26 witnesses, the majority of whom testified about Shakur's public, political, and non-violent activities, extending over a number of years, and the concerns about governmental persecution that Shakur harbored as a result. In addition to calling fact and expert witnesses to challenge certain aspects of the government's proof against Shakur, his attorneys vigorously attacked the credibility of Rison.

*The Case for Buck*

In a similar vein, Buck called witnesses who sought to portray her as a political activist, most recently concerned with what she perceived as the African–American liberation struggle, but not a participant in violent crimes in aid of that struggle. Fact and expert witnesses were also called in an effort to meet some of the government's proof with respect to particular incidents. Buck's counsel also assailed Rison's credibility. Buck did not take the stand.

*The Strickland Declarations*

Claude Strickland gave two written declarations, made under penalty of perjury, to counsel for Shakur in connection with the present petition. Counsel for Shakur say that they used the New York Freedom of Information Law, an Article 78 proceeding, and private investigators, who eventually led counsel to Strickland in January 1997. Affidavit of Michael W. Warner, Esq., co-counsel for Shakur, verified March 11, 1998, at ¶¶ 2–4. Strickland's first declaration is dated

April 18, 1997 and was submitted with Shakur's initial papers. His second declaration is dated December 16, 1997, and was included in Shakur's reply to the government's answering papers. I shall refer to these two documents as "CS1" and "CS2" respectively.

Strickland says that he is a retired police officer, having served on the New York City Police Department ("NYPD") for 25 years, and in the NYPD's Intelligence Division during the period covered by his statements. CS1, ¶ 1. Between 1967 and 1979, Strickland was working undercover, joining groups and submitting written reports to the Intelligence Division on the activities of those groups and its members.

In 1967, Strickland was a member of the Brooklyn Congress of Racial Equality ("CORE"). In 1968, he joined an organization called the Republic of New Afrika [sic] ("RNA"),[2] where he met Mutulu Shakur and Tyrone Rison. CS1, ¶ 2. While working undercover with a number of organizations, Strickland "was known on the street by the name Ky Farin or Claud Farin. A number of the people who were involved in the RNA and other Black militant organizations knew me as Claud." CS2, ¶ 6.

Rison and Strickland served together on "Security" for the RNA during the course of many public events, both carrying firearms. Strickland says that Rison appeared to him "to be anxious to do more militant action," and "would talk about violence," but Shakur "tried to calm him down and was concerned that the people involved in security not get involved with anything else." CS1, ¶ 3. RNA Security "was a defensive group and certainly not a military force," involved in providing protection against any disturbances at RNA events. CS1, ¶ 4. This security force, called "the Black Legion" of the RNA, "was not involved in organizing any violent or criminal activities." On the contrary, Strickland concluded from his participation and observation that "the Black Legion was involved in trying to prevent any violence." CS2, ¶ 5.

During his undercover activities, Strickland knew Mutulu Shakur by his given name,

Jeral Williams, as well as by his African name. During the early years of his undercover work Strickland often referred to Shakur as "Brother Jeral." CS2, ¶ 9. Expanding upon Strickland's observation of and associations with Shakur, typewritten ¶ 7 of CS1 reads as follows:

I believe I first met Dr. Shakur in 1968. I first saw him at the CORE office in Brooklyn. I also saw him at RNA meetings, events and activities. I saw him also at the Lincoln Detox Center at Lincoln hospital. During this entire period I reported on Dr. Shakur—what he was doing, saying and participating in. It is my best recollection that I never saw him with an automatic or semi-automatic rifle. I never heard him participate in a discussion that I believed to be a plan to do a criminal act and I never saw him do a criminal act. What I observed and heard concerning Mutulu Shakur showed him to be an active participant in the militant part of the Black Nationalist movement but not someone engaged in criminal or violent behavior. For example, Dr. Shakur and I were both at an RNA Convention at the New Bethel Church in Detroit, Michigan in 1969 when there was a shoot out resulting in the death of one police officer and serious injury to another. Dr. Shakur did not engage in any of the shooting or violence.

That language is followed by a handwritten notation, initialed by Strickland:

I was outside of the church when the shooting took place and did not observe anyone shooting. I cannot say that I never heard him talk about a criminal act. It has been so long ago that I don't recall. I cannot remember any criminal acts that he was involved in or if he had any kind of weapon.

¶ 8 of CS1 reads as follows:

During this entire period, Dr. Shakur actively participated in supporting cases involving RNA, Black Panther members and other Black militants who had been charged with criminal activity. He was involved in building public support and in

---

**2.** *Shakur belonged to the RNA at the times described in the indictment and during the trial.*

*Several RNA officers testified on his behalf at the trial.*

obtaining information that might be helpful to the defense lawyers. He also served as a line of communication between the attorneys and the defendants who were put in jail. I know he would go to the court when some of these cases were on trial. He would participate in demonstrations on some of these cases and worked on getting out propaganda concerning defendants in these cases. I reported on all these activities although I do not recall thinking that any of this activity violated the law.

In their discussions of Rison the Strickland statements focus upon a rifle. CS1, ¶¶ 5 and 6 read as follows:

5. Mr. Rison had a rifle with a magazine. He showed us how to use it. He told me that he had got it off the base at Fort Bragg. He said that was when he was in Wilmington, N.C. The only person I ever saw with this weapon was Mr. Rison. I never saw Dr. Shakur with this weapon.

6. I reported about Mr. Rison and the automatic weapon to the Intelligence Division. I also reported that he said he had gotten the weapon from Fort Bragg.

Dealing further with that subject, Strickland says in CS2, ¶ 3:

When Mr. Rison told me that he had gotten the rifle off the base at Fort Bragg he did not say that he had gotten it from anyone else who had taken it from the base at Fort Bragg. In the way that Mr. Rison spoke I understood him to say that it was he who took the rifle off the base at Fort Bragg and that he had actually stolen it. He may not have used the word "steal", but because of what he did say and his not describing anyone else involved in his getting the rifle I understood that what he was saying was that he had actually stolen the rifle which was at Fort Bragg.

Strickland estimates that during his undercover work, he furnished the Intelligence Division with about 500 typewritten reports, concerning the RNA, Shakur, Rison, and other individuals. He further estimates "200 or more mentioned Mutulu Shakur's name and 200 or more mentioned Tyron Rison's name." CS1, ¶ 9. With respect to these reports, and the question of Rison and the rifle, Strickland says in CS1, ¶ 10:

There is no doubt that from the reports I handed in, the Intelligence Division knew of Mutulu Shakur from 1968 forward. Those reports associated him with the Black Nationalist movement in general and the RNA and militant Black activists, in particular. There is also no doubt that from my reports the Intelligence Division knew that Tyron Rison had gotten the automatic weapon from the base at Fort Bragg, that he was the only one who had this weapon and that I never saw Dr. Shakur with that weapon.

Strickland concludes CS1 by saying at ¶ 11:

Some time prior to the federal trial of Dr. Shakur one of my chiefs at the Intelligence Division asked me what I knew about Dr. Shakur. They wanted me to write notes about Dr. Shakur—everything I knew, but not put my name on it. I refused to write notes without putting my name on them. I believe this information was asked of me for the Federal Government.

Expanding on that subject in CS2, ¶ 4, Strickland reasons that the request from "someone at the Intelligence Division" for his notes about Shakur was made after the Nyack/Nanuet incident, "and the trial of Dr. Shakur was going to occur." [3]

### DISCUSSION

Shakur and Buck petition to vacate their convictions and for a new trial on constitutional grounds and pursuant to Rule 33, Fed. R.Crim.P. They contend that the substance of Strickland's declarations entitle them to habeas relief for two reasons.

First, petitioners argue that the government failed to disclose to them prior to trial the identity of Strickland, the nature of his undercover police activities, and his reports to the NYPD generated by those activities.

---

**3.** In point of fact, Shakur became a fugitive after the failed Nyack/Nanuet armored car robbery and was not apprehended by federal authorities until February 11, 1986. It is not clear from Strickland's statements when within this time frame the request for his notes about Shakur was made.

Petitioners regard this non-disclosure as violative of *Brady.*

Second, petitioners' argue that the Strickland declarations show that at trial the government made knowing use of perjured testimony by Rison.

I will consider those contentions in order.

## A. *Brady*

### 1. General Principles

■ "In order to establish a *Brady* violation, a defendant must show, *inter alia,* (1) that the government failed to disclose favorable evidence, and (2) that the evidence it suppressed was material." *United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995), *cert. denied,* 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996) (internal quotation marks and citations omitted). As appears from the Second Circuit's discussion at 63 F.3d at 1208–11, the second element articulated in *Payne* contains has two separate components: *suppression* of evidence by the government, and the *materiality* of the evidence suppressed.

■ Furthermore, I think it evident that nondisclosed evidence must have been *admissible* at trial if known to the defense. Evidence cannot be material, as that element is construed, if it was not admissible, and so could not have come before the jury.

■ Before further considering those components, one should note that evidence "favorable" to the defendant is defined broadly. "The government's *Brady* obligation to disclose material evidence favorable to a criminal defendant applies not only to exculpatory evidence, but also to evidence that could be used to impeach government witnesses." *United States v. Orena,* 145 F.3d 551, 557 (2d Cir.1998) (footnote and citations omitted). The government has a duty to disclose favorable evidence, "even if no specific request is made by the defense." *Payne,* 63 F.3d at 1208 (citations omitted).

■ Evidence favorable to the defendant must have been known to the government to implicate *Brady,* since "[t]he *Brady* obligation extends only to material evidence that is known to the prosecutor." *United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998) (citation omitted). *See also Payne,* 63 F.3d at 1208 (the government has "an affirmative duty to disclose favorable evidence *known to it* ") (emphasis added). Absent prosecutorial knowledge, by definition there can have been no governmental suppression of evidence. But the boundaries of the government's knowledge—actual or constructive, real or presumed, direct or imputed—are not drawn with precision. It is well settled that those boundaries extend beyond the individual prosecutor or prosecutors who obtain the indictment and conduct the trial. "[T]he individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). "The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation." *Payne,* 63 F.3d at 1208 (citing *Kyles v. Whitley* ). But the court of appeals cautioned in *Avellino,* 136 F.3d at 255:

> Nonetheless, knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis.

(internal quotation marks and citations omitted).

In *United States v. Zagari,* 111 F.3d 307, 320 n. 13 (2d Cir.1997), the Second Circuit observed that "[t]he extent to which knowledge may be imputed from one federal agency to another for *Brady* purposes is as yet unclear;" it avoided the issue in that case, stating that "it is clear to us that *Brady* was not violated because of the lack of materiality and the defendant's ability to access" the information in question "with due diligence." *Id.*

■ Evidence favorable to the defendant but not disclosed to him is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *Kyles v. Whitley,* 514 U.S. at 433, 115 S.Ct. 1555 (internal quotation marks and citations omitted). In other words, evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S.Ct. 1555. *See also Orena,* 145 F.3d at 557; *Payne,* 63 F.3d at 1209.

### 2. *Petitioners' Brady Contentions*

Petitioners perceive in the Strickland declarations violations of both prongs of *Brady:* exculpation and impeachment.

Petitioners characterize those declarations as exculpatory of Shakur because Strickland's descriptions of Shakur's activities are consistent with Shakur's theory of the case, namely, that he was an activist but not a criminal or violent one. Arguably that aspect of the Strickland declarations also exculpates Buck, who the government contended was a second-tier member of the organization that Shakur headed.

Petitioners also view the Strickland declarations as impeaching Rison on the subject of how Rison obtained a rifle. As noted, Strickland understood Rison to be saying that he, Rison, had stolen an automatic rifle and magazine from the Army base at Fort Bragg. To place this *Brady* claim in context, it is necessary to recall that during Rison's cross-examination at trial by Chokwe Lumumba, Esq., co-trial counsel for Shakur, Rison gave this testimony:

Q. And what you did is you snuck into some place and stole an M–16, didn't you?

A. No, sir.

Q. You remember talking to the Reverend Ben Chavis, don't you?

A. Yes, sir.

Q. And in his presence admitting that you had stolen an M–16, right?

A. No, sir.

Q. So if you don't remember that, then you wouldn't remember them putting you out of the defense ministry because of that, would you?

MS. MARTIN: Objection.

THE COURT: Sustained as to form. It's argument.

Q. You don't remember being put out because of that?

A. The event never happened that you just described.

Tr. 2513.

Petitioners claim that if Strickland's declarations about Rison's theft of the rifle had been disclosed, defense counsel could have attacked Rison's credibility more effectively, a significant circumstance given the centrality of Rison's testimony to the government's case.

### 3. *The Government's Responses to the Brady Claims*

The government makes three principal responses to petitioners' *Brady* claims.

First, the government contends that because it had no knowledge, actual or imputed, of Strickland's status as an NYPD undercover agent, or of the existence or substance of his reports to the NYPD, the government did not "suppress" that information or otherwise fail to disclose it to the defense, so that no *Brady* violation arises.

Second, the government contends that even if the defense had known all about Strickland and his declarations at the time of trial, the rules of evidence would have precluded defense counsel from making any use of that information.

Third, the government contends that the evidence relating to Strickland and his declarations was not material for *Brady* purposes.[4] I will analyze these issues in turn.

---

**4.** As noted in footnote 1, *supra,* the government also contends that petitioners' failure to bring their habeas claims at an earlier date creates a procedural bar to their being considered now. The government relies upon *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). In *Frady,* the Court rejected a habeas petitioner's collateral attack upon his murder conviction 19 years earlier. Petitioner contended that he was convicted by a jury erroneously instructed on the meaning of malice, thus eliminating any possibility of a manslaughter verdict.

### 4. *Analysis*

#### (i) *The Government's Knowledge*

■ The attorneys who prepared and presented the government's case against petitioners were AUSA Elliott B. Jacobson and former AUSA Kerri Martin Bartlett ("Martin"). Jacobson and Martin were assisted by FBI agents assigned to the case, the two lead case agents being Leo E. Herman and David Mitchell.

The trial of Shakur and Buck before this Court was the second of two federal trials involving the Brinks armored truck hold-up which occurred in October, 1981. Another group of defendants were tried some years earlier before Judge Duffy of this Court and a jury. The FBI lead case agents assigned to assist the prosecutors in that case were Robert Cordier, Kenneth Maxwell, and Louis Vizi.

At the time of these trials, these FBI agents were assigned to the Domestic Terrorist Task Force of the FBI ("DTTF"). In May 1980, the FBI formed the Joining Terrorist Task Force ("JTTF"). At the time of the trial of Shakur and Buck in 1987–1988, the JTTF consisted of the DTTF, and two other squads which confined their efforts to international terrorism. The JTTF was and is compromised of special agents of the FBI and New York City police officers who have been assigned to the JTTF. After the World Trade Center bombing, law enforcement officers from other federal and local agencies became part of the JTTF, but that did not occur until after the trial of Shakur and Buck. The JTTF was operated under the command and control of the FBI. New York City police officers assigned to the JTTF are sworn in as Deputy United States Marshals. Special agents of the FBI on the JTTF are not sworn in as members of the police force.

In opposition to the present petitions, Jacobson, Martin, and Herman have submitted sworn affirmations which discuss their knowledge, or to be more precise their lack of knowledge, of anyone named Claude Strickland, or Claud or Ky Farin.

Jacobson says at ¶¶ 6 and 7 of his affirmation:

6. I have no recollection of ever having heard or seen the name of Claude Strickland until reading it in Shakur's instant habeas petition. Furthermore, outside of the allegations made in Shakur's papers and the supporting affidavit thereto, I have never had any knowledge that anyone named Claude Strickland was an undercover police officer in the Intelligence Division of the New York City Police Department.

7. Likewise, outside of hearing and reading the assertions made during the testimony of defense witness Sekou Owusu, I have no knowledge or nor have I ever been aware of any undercover agent or undercover police officer using the undercover identity of Claud or Ky Farin.

Martin's affirmation at ¶¶ 6 and 7 contains identically worded disclaimers.

Herman says in his affirmation at ¶¶ 10 and 11:

10. Until reading the name Claude Strickland in Shakur's instant habeas petition, I had never heard of this individual, nor have I ever been aware that an individual by that name was an undercover police officer in the Intelligence Division of the New York City Police Department.

11. Likewise, outside of reading the assertions made during the testimony of defense witness Sekou Owusu, I have no knowledge of nor I have ever been aware of any undercover agent or undercover police officer using the undercover identity of Claude or Ky Farin.

Defense counsel had not objected to the trial court's charge at the time. In that circumstance, the Court held that to obtain collateral relief, petitioner "must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." 456 U.S. at 168, 102 S.Ct. 1584. The Court continued: "In applying this dual standard to the case before us, we find it unnecessary to determine whether Frady has shown

cause, because we are confident he suffered no actual prejudice of a degree sufficient to justify collateral relief 19 years after his crime." *Id.* (footnote omitted). Thus the Court did not reach the question of delay, the proposition for which the government cites *Frady* in the case at bar. To the extent that the government argues petitioners at bar could have by due diligence learned of Strickland's status and reports at an earlier time, I do not agree.

Each of these affirmations refers to assertions made during the testimony of a witness named Sekou Owusu. Owusu, a member of the RNA, was called by Shakur as a defense witness. Under direct examination by Shakur's attorney, Chokwe Lumumba, Owusu testified with respect to an individual he had known as "Ky Farin":

> A. He ceased functioning after a meeting that myself and Dr. Shakur had with him. It was initiated by Dr. Shakur where Dr. Shakur the first time to my knowledge, I guess, told Ky Farin that he felt that he was an agent of the United States Government or some government vehicle.
>
> Q. Did you ever see Mr. Farin again?
>
> A. After that point, that was about the last time we saw Mr. Farin.
>
> Q. Did you ever see him depicted in any picture again?
>
> A. Yes, I did.
>
> Q. Showing you Shakur DD.
>
> MR. JACOBSON: Could we have a side bar?

Trial Tr. 11,405.

At sidebar, the government questioned the relevance of Shakur Exhibit DD, a newspaper photograph depicting Mayor Koch, and another individual, presumably "Ky Farin," standing next to the Mayor. AUSA Jacobson stated at sidebar:

> I assume they want to put in—this is, for the record, Shakur's DD for identification, it's Daily News article—paper, and I assume Mr. Lumumba from what he has shown me wants to put in the front page which shows a photograph of an individual standing next to Mayor Koch.
>
> Now, I don't know if that is Mr. Farin, I don't know if Mr. Farin was an FBI informant or not or someone who was in the RNA got pissed off because he was falsely accused and—I don't know what it is. Seems to me they are getting far afield now...

*Id.*

Counsel for Shakur was allowed to put these follow-up questions:

> Q. We are showing you DD. Who is the gentlemen who appears in that photograph?
>
> A. Claude Farin as I knew him.
>
> Q. Do you know the person who appears next to him?
>
> A. Yes, Mayor Koch.

Tr. 11,409. Further colloquy of counsel then ensued. Mr. Lumumba said of the prosecutors:

> This man Ky Farin, they know he works for them, has been working for them for years, and that's probably one of the reasons why they put in that provision in the jury voir dire in case that kind of stuff had to come up.
>
> I mean, let them just tell you "we deny it, we deny that Ky Farin is an informant or that he has been an informant either for the City of New York or for the FBI over a period of years with the RNA." Let them deny it.

Tr. 11,429.

That prompted the following response from AUSA Martin:

> Your Honor, again, this is exactly back to what I am arguing. Mr. Lumumba is again arguing this all for its truth. That's the argument he made to you, Judge, "You have to let in, it's true, it's true." And if this proceeding is about the rules of evidence, the only way this stuff comes in anyway would be for state of mind and, again, the truth is not relevant. I can say quite honestly that there are three people sitting at the government's table, until Mr. Lumumba cross-examined Tyrone Rison about this individual, I never even heard the name before and I am supposed to be the lead government prosecutor on this case. It just shows you how far afield from this case we have gotten.

Tr. 430.

Reverting to the affirmations submitted on these petitions by the government, Jacobson says at ¶ 8:

> I never asked or directed anyone else to ask Claude Strickland to take notes about Mutulu Shakur or anyone else for any purpose whatsoever. I am aware of no request of such a nature. And, I have

never seen or read any notes or reports which might have been prepared by Claude Strickland, if indeed there are any such notes or reports.

Martin's affirmation at ¶ 8 contains an identically worded disclaimer, as does the affirmation of FBI Agent Herman at ¶ 12.

The Herman affirmation recites at ¶ 14:

I have been informed by Agents Mitchell, Maxwell, Cordier and Vizi that none of them have any knowledge whatsoever of any undercover police officer or anyone else named Ky or Claud Farin or Claude Strickland and that they never asked or directed anyone else to ask anyone named Claude Strickland to take notes about Mutulu Shakur or anyone else for any purpose whatsoever. Further, none of them is aware of any request of such a nature. And, none of them ever saw or read any notes or reports which might have been prepared by Claude Strickland, if indeed there are any such notes or reports.

Herman prefaced those statements by observing that while a number of New York City Police Department detectives assigned to the JTTF worked on both Brinks cases, "they did not play any supervisory role, but rather carried out various tasks assigned to them by the lead case agents and other FBI agents assigned to this matter." *Id.* at ¶ 13.

The affirmations of Jacobson and Herman describe the efforts made by the FBI, in response to the present petitions and at Jacobson's direction, to retrieve all of the records of the United States Attorney for this District "pertaining to Shakur and Buck, including all investigative files and all files related to the indictments, trial and appeals in this case as well as the files related to the investigation and trial before Judge Duffy of Shakur's co-indictees." Jacobson affirmation at ¶ 9. When retrieved, that considerable quantity of documents was searched by AUSA David Greenwald, who advised Jacobson that the files contained "no notes or reports or summaries of any notes or reports of an undercover police officer named Claude Strickland, or of an informant or undercover

police officer or agent's named Ky or Claud Farin." *Id.*

In short, the government's prosecution team (AUSAs and lead FBI agents) deny any knowledge of the factual circumstances upon which Shakur and Buck base their present petitions, namely, Strickland/Farin's status as an NYPD undercover police officer and reports he made to the police about his activities. Nor, according to the government affirmations in opposition to those petitions, do the files of the United States Attorney's Office generated by the two Brinks prosecutions contain any information pertinent to the petitioner's assertions.

On the subject of files, it is appropriate to note that at Jacobson's direction, FBI Agent Herman conducted a search for "all FBI records referring to and/or relating to Claude Strickland and Ky/Claude Farin." Second Jacobson affirmation at ¶ 4. The government submitted that file to the Court for *in camera* inspection. My examination reveals no document indicating that an individual under such name or names was acting as an undercover agent for the New York City Police Department or any other law enforcement agency, or was generating written reports in that capacity.[5]

Shakur and Buck offer no concrete or specific proof to contradict the assertions of the federal prosecutors and agents involved in the case that prior to the present petitions, they had no knowledge of Claude Strickland, his NYPD undercover activities (under that name or the Farin name), or the existence or contents of written reports generated by those activities.

While Strickland himself might logically be regarded as a potential source of such proof, the fact is that his two declarations negate, rather than demonstrate, federal knowledge. Strickland's first declaration says that he *rejected* the request of a superior at the Intelligence Division to write notes about what Strickland knew about Shakur, but not put his name on them. ("I refused to write notes without putting my name on it." CS1,

---

5. The Court, while reviewing the contents of that FBI file *in camera*, declined to permit petitioners' counsel to examine the file, for reasons stated in a Memorandum Opinion and Order dated December 10, 1998, familiarity with which is assumed.

at ¶ 11). Strickland expressed his belief that "this information was asked of me for the Federal Government," *id.*, a belief based upon the timing of the request, "after the armored car robbery in Westchester County and a trial of Dr. Shakur was going to occur," CS2 at ¶ 4.[6] But whatever the force of Strickland's reasoning as to the author of this request, the fact is that he refused to comply with it, so that, on Strickland's own account, the "Federal Government" acquired no knowledge relevant to Shakur from Strickland.

Lacking any direct evidence of knowledge on the part of the federal prosecution team, petitioners undertake to demonstrate circumstances from which such knowledge should be imputed or inferred.

First, petitioners point to an FBI document the government submitted as an exhibit to the affirmations of Jacobson and Martin. It is a directive dated January 2, 1970 from the Director of the FBI (the late J. Edgar Hoover) to the Special Agent in Charge ("SAC") of the New York Office. The captioned "subject" of that directive was "Jeral Wayne Williams" (the American name of Shakur). "Claudie Strickland" is also referred to in the body of the directive. Because of references to these individuals in other FBI documents (Strickland being identified as "the Commander of the Black Legion in Manhattan, New York"), the New York Office is instructed with respect to Williams that the case on him "should be reopened and appropriate investigation conducted." The directive continues:

A case should be opened on Claudie Strickland. Background data regarding him should be developed and the extent of his involvement with the Republic of New Africa should be determined.

Results of your investigations concerning the subject [*i.e.*, Williams] and Strickland should be submitted in a form suitable for dissemination accompanied by Security Index and/or Agitator Index recommendations if warranted.

Shakur, who had obtained a redacted version of this document in response to an FOIA request, points to differences in certain notations on the two copies, and to the fact that the FOIA copy had a second page, whereas the copy submitted on these petitions does not, leading Shakur to conclude that "the FBI maintained 2 sets of records concerning defendant." Reply Brief at 5. Moreover, while Shakur's FOIA request unearthed the New York Office's report on him, his brief states that "there is no document revealing any investigation on Strickland," which leads Shakur to conclude that "after 1/2/70 when the investigation was conducted the FBI must have found out that Strickland was an agent for the New York police and, therefore, no investigation report was going to be memorialized nor was it needed." *Id.* at 6.

There is less to all this than meets the eye. The seeming discrepancies in the notations on the two copies of the January 20, 1970 memorandum are satisfactorily explained by the affirmation dated February 5, 1998 of Rick M.T. Sabel, a supervisory FBI paralegal, whose entirely plausible averments I need not recount in detail. As for the New York Office's investigation of Strickland, that office reported the results to the Director in a memorandum dated April 29, 1970. Shakur's FOIA request did not turn that document up because he is not mentioned in it. The report on Strickland, which is included in the FBI file examined by the Court *in camera*, states:

NYO [New York Office of the FBI] indices reflect no pertinent information re subject.

Inasmuch as no information has been developed pertaining to subject's background as well as the fact that subject's alleged association with the RNA has been limited to one instance reported by a source from outside of New York City, no further investigation of this matter will be conducted by the NYO, UACB.

There is no indication in the FBI file that the FBI conducted any further investigation of Strickland.

The FBI file also contains a number of documents generated in the 1970's which contain references to "Ky Farin." The sub-

---

6. Strickland is undoubtedly referring to the Brinks robbery at Nanuet, which is in Rockland County, not Westchester. Shakur became a fugitive before the first federal trial began.

stance of those references is that Farin on occasion was among the attendees at meetings or functions of the RNA or affiliated groups. There is no indication in the file that Farin ever acted as a NYPD undercover agent.

All these documents show is that, during the times Strickland says he was an NYPD undercover *acting out the role of an RNA member,* using his own name or that of Ky Farin, he came to the attention of the New York Office—*as an RNA member.* Strickland appears to have played his role with sufficient conviction to fool those observing him, including the FBI and that agency's own informants. The contemporaneous documents show that the FBI expended no further investigatory resources on Strickland, not because (as Shakur contends in a wholly speculative argument) the federal government had learned Strickland was an NYPD undercover, but because he was not regarded as a *sufficiently important player in the* RNA.

Petitioners also rely upon a number of other documents Shakur obtained from the FBI in response to his FOIA request. *See* Shakur Reply Brief at 8–13 for a discussion of those documents. They show, Shakur argues, "the connections between the investigatory activities of the NYPD and its Intelligence Division and the individuals and subjects involved in this case," *id.* at 9, as well as "the conveying of this information (and its accessibility) to the FBI," *id.* at 10.

In general terms, these are accurate characterizations of the documents in question. They show that beginning in the late 1960's, and continuing thereafter, the NYPD and its intelligence arms were interested in the activities of groups such as the Black Libera-

tion Army, the Black Panther Party, and the RNA, and individuals connected with them, such as Joanne Chesimard and Anthony La-Borde (both of whom had been or became involved in violent crimes). The documents also reflect FBI activities in these areas, and make it plain that on occasion the NYPD and FBI exchanged information on such subjects in a cooperative manner.

It may first be observed that these local and federal law-enforcement activities and communications are not particularly surprising. The political climate of the times, of which Director Hoover was a catalyst in what was far from his finest hour, brought federal and local forces together for surveillance and intelligence-gathering purposes. As previously noted, the JTTF was itself a joint operation, directed by the FBI, but including NYPD officers who were sworn in as deputy United States Marshals for the purpose.[7] Moreover, the crimes of violence involved in the case at bar, and others typical of the times, offended both federal and local law, so that some cooperation between these concurrent jurisdictions could only be expected.

But these general considerations fall far short of justifying an inference that the AUSAs prosecuting Shakur and Buck, and the FBI lead agents on the case, knew about Claude Strickland, who he was, and what he said and did. The leap from generalized cooperation in matters of common concern to specific knowledge of a particular case is too great.

Petitioners' final effort in this regard is to stress the belief Strickland formed, previously noted, that an NYPD superior's request that he prepare unsigned notes about Shakur was made "for the Federal Government." Assuming *arguendo* that the government had

---

7. I think it likely that the JFFT structure contributed to a comment made by then United States Attorney Rudolph Giuliani, which petitioners emphasize. After the jury convicted the petitioners, Giuliani issued a press release praising AUSAs Jacobson and Martin and FBI agents Herman and Mitchell, and also expressing "gratitude to the numerous other law enforcement agencies involved in the prosecution of this case, including the New York City Police Department, the Rockland County law enforcement agencies, the New Jersey State Police, the Nassau County Police Department, the Danbury, Ct. Police De- partment, and the Allegheny County, Pa., Police Department." Shakur highlights Giuliani's reference to the "New York City Police Department" as evidence of "the cooperation and team work of the NYPD in the prosecution of this very case," Reply Brief at 12, from which the prosecution team's knowledge of Strickland should be inferred. In point of fact, Giuliani threw a verbal bouquet in the direction of every police department in sight, although the NYPD's participation in the JFFT gave that department a particular *cachet.*

something to do with this request (which Strickland in any event refused), the fact that the request was made at all is inconsistent with the notion that the NYPD was keeping federal authorities advised on a contemporaneous basis of everything an NYPD officer was doing or reporting about everyone that officer came to observe during undercover operations.

It follows that petitioners have failed to sustain their burden of proving that the government had actual knowledge of the existence of Strickland (or "Ky Farin"), his status and activities as an NYPD undercover agent, and the reports he made to his superiors in that capacity.

It remains to consider whether, on the facts of the case, such knowledge should be imputed to the government.

The most that can be said for petitioners on the present record is that between 1967 and 1979, Claude Strickland worked in an undercover capacity for the Intelligence Division of the NYPD, and forwarded to his superiors hundreds of written reports which mentioned either Shakur or Tyrone Rison. The record does not support any finding with respect to what these unknown superiors did with Strickland's reports. Accordingly, to visit awareness of Strickland and his reports upon the federal prosecution team on the basis of imputed knowledge, the knowledge of those NYPD superiors must be imputed to AUSAs Jacobson and Martin and FBI agents Herman and Mitchell, the federal officers in charge of the investigation and prosecution of the case against petitioners.

This is not the stuff of which imputed knowledge is made. The imputation of the knowledge of Strickland's superiors to the federal prosecution team would, as a practical matter, impose "an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case," contrary to the Second Circuit's caution in *Avellino,* 136 F.3d at 255. A contrary rule "would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *Id.* (citing and quoting *United States v. Gambino,* 835 F.Supp. 74, 95 (E.D.N.Y.1993), aff'd, 59 F.3d 353 (2d Cir.1995), *cert. denied,* 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996)).

The Second Circuit has repeatedly refused to impute knowledge of another branch of the federal government to the particular federal prosecutors in charge of the case in question. *See United States v. Locascio,* 6 F.3d 924, 949 (2d Cir.1993), *cert. denied,* 511 U.S. 1070, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994) (refusal to impute to the AUSAs prosecuting the action knowledge of reports prepared by FBI agents who were uninvolved in the investigation or trial of the defendants); *United States v. Stofsky,* 527 F.2d 237, 244 n. 7 (2d Cir.1975), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976) (refusal to impute to the prosecution knowledge of information contained in a government witness's tax return on file with the IRS); *United States v. Quinn,* 445 F.2d 940, 944 (2d Cir.), *cert. denied,* 404 U.S. 850, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971) (refusal to impute to the New York AUSA prosecuting the case the knowledge of a Florida AUSA that a grand jury in his district had returned a sealed indictment against a cooperating witness, the court of appeals "rejecting as completely untenable [the] position that knowledge of any part of the government is' equivalent to knowledge on the part of this prosecutor") (internal quotation marks omitted).

The Second Circuit's holdings in habeas cases involving the knowledge of state prosecutors are to the same effect. *See Pina v. Henderson,* 752 F.2d 47 (2d Cir.1985) (state prosecutor did not violate *Brady* by failing to produce an exculpatory statement made to a state parole officer where that officer "did not work in conjunction with either the police or the prosecutor"); *Morgan v. Salamack,* 735 F.2d 354, 358 (2d Cir.1984) (refusal to impute to state prosecutor information in NYPD's files that might have been used to impeach complaining witness, where the evidence in question "was not probative of appellant's innocence" and "was not in the prosecutor's file").

Since in the case at bar the knowledge imputed to the federal prosecutors would be that of local police officers, these all-federal and all-state cases apply *a fortiori.*

I conclude that under the governing law of this circuit, whatever knowledge Strickland and his NYPD superiors gained about Shakur and Rison during Strickland's undercover activities between 1967 and 1979 may not be imputed to the federal prosecution team that brought Shakur and Buck to trial in 1987. To hold otherwise would require the government to ask non-federal offices about possible inquiries made eight years or longer before trial, on pain of violating *Brady*. That proposition cannot be reconciled with Second Circuit authority.

Petitioners' citations from other circuits do not require a different result. In *Smith v. Secretary of New Mexico Dept. of Corrections*, 50 F.3d 801 (10th Cir.), *cert.denied*, 516 U.S. 905, 116 S.Ct. 272, 133 L.Ed.2d 193 (1995), the bodies of two murdered women were found in a county other than the county in which they lived. The police departments of both counties investigated the crime. The district attorney of the county of residence prosecuted it, and failed to disclose exculpatory evidence generated by the police department of the county where the bodies were found. That failure violated *Brady*, the Tenth Circuit held, because the concept of "prosecution" for *Brady* purposes extended to "law enforcement personnel and other arms of the state involved in investigative aspects of a particular criminal venture." 50 F.3d at 824.

I am not sure that *Smith* conforms to the limitations imposed by the cited Second Circuit cases on imputed knowledge; and to the extent that the Tenth Circuit expands those limitations, I am bound by the law of this circuit. In any event, *Smith* is distinguishable on its facts, because both county police departments were investigating the crimes of prosecution and conviction. In the case at bar, not only is there no evidence that Claude Strickland or the NYPD Investigations Department to which he reported had anything to do with investigating the crimes of which petitioners were convicted, the proof is to the contrary. Strickland had ceased his NYPD undercover activities before those crimes were committed; and the JTTF, which investigated them, was directed by the FBI. That a number of NYPD officers, sworn in as deputy U.S. Marshals, belonged to the JTTF does not bring this case within the rationale of *Smith*.

*United States v. Zuno–Arce*, 44 F.3d 1420 (9th Cir.), *cert. denied*, 516 U.S. 945, 116 S.Ct. 383, 133 L.Ed.2d 306 (1995), is distinguishable on the same ground. The Ninth Circuit reasoned: "[i]f all agencies involved in the case were instructed to turn over witness interviews bearing on the Camerena murder case, these reports would have been referenced ... [T]he prosecutor is deemed to have knowledge of and access to anything in the custody or control of any federal agency *participating in the same investigation of the defendant*." 44 F.3d at 1427 (emphasis supplied) (internal quotation marks and citation omitted). On that basis, the Ninth Circuit in *Zuno–Arce* imputed to a Central District of California AUSA knowledge of evidence amassed by a Phoenix, Arizona FBI office not a member of the prosection team. Again, I am not sure that this result may be squared with Second Circuit authority, but the case is distinguishable from the one at bar for the reason given in distinguishing *Smith, supra.*

Petitioners do cite a Second Circuit case, *United States v. Morell*, 524 F.2d 550 (2d Cir.1975), but it is entirely inapposite. In *Morell*, a narcotics case, the prosection failed to turn over the DEA case agent's file on the government's principal witness, an informant, which contained impeachment material, despite a specific defense request for such documents. *Morell* furnishes no guidance in the case at bar.

Petitioners at bar say that the inquiry should not be limited to "the few documents that have been produced to [petitioners] by the NYPD and particular documents produced in other cases," Shakur Reply Brief at 9 n. 8. They demand far-ranging discovery of documents and the depositions of law enforcement officers, federal and local. Specifically, counsel for Shakur submit a "Summary of Proposed Discovery" which includes the following:

**I. *Depositions***

Kerri Martin Bartlett, Esq.

James Brophy, FBI Special Agent

Edwin Cooper, NYPD

John Finnegan, NYPD

Sergeant Fonlet, Queens Area Task Force

Neil E. Herman

Harold Hess, NYPD

Robert J. Howe, Deputy Inspector, NYPD

Intelligence Division Police Officer to whom Strickland gave his reports

John J. Kearney, Supervisor, FBI

Mitchell Lustgarten

J. Kevin O'Brien, FBI–FOIA Chief

H. O'Connell, FBI SA

Tyrone Rison

Kevin W. Rohan, Inspector NYPD

John K. Vaughan, Lt. NYPD

Charles J. Wells, Lt. NYPD

Michael Willis, NYPD

## II. *Document Request*

— The Strickland Reports

— All NYPD documents referring to Claudie Strickland or any of his reports

— All documents in the 29,000 pages not produced by the FBI consisting of or referring to communications between NYPD and the FBI, or U.S. Attorney's Office concerning or involving Claudie Strickland, Mutulu Shakur

— All FBI documents consisting of an investigation of Claudie Strickland or referring to Claudie Strickland

— All FBI investigative reports referring to or relating to someone named Ky Ferrin, Kenneth Farin and Claudie Strickland.

Petitioners base those demands upon a prediction:

There can be no doubt that a full disclosure of the documents pertaining to the NYPD investigatory activities concerning [Shakur] and the subjects of the criminal case, communications between the NYPD and its Intelligence Division and the FBI and activities of the NYPD/ID in this case, will reveal significant facts of the knowl-edge and constructive knowledge of the FBI and U.S. Attorney's Office.

*Id.*

■ A habeas petitioner is not entitled to discovery unless the court grants leave. *See* Rule 6(a) of the Rules Governing § 2255 Proceedings. Thus the question is committed to the district court's discretion. Petitioners' proposed discovery is far too broad. *See* n. 9, *infra.* However, assuming that following discovery it should appear that knowledge of the contents of Strickland's undercover reports should be imputed to the federal prosecution team, petitioners' *Brady* contentions fail because they can satisfy neither the requirements of admissibility nor those of materiality.

### (ii) *Admissibility*

The substance of Strickland's declarations with respect to his observations of Shakur's conduct is that at those times, Shakur did not engage in any shooting or violence, or otherwise violate the law.

Petitioners now contend that such testimony by Strickland, if known to them, would have been exculpatory: as to Shakur directly, as portraying a man not given to violence; and as to Buck derivatively, as a person whom the evidence showed was closely associated with Shakur in his activities.

The admissibility of Strickland's testimony at trial, if offered by petitioners, is problematic. Strickland does not claim to have personal knowledge of any of the criminal acts charged in the indictment and upon which petitioners were convicted. Indeed, Strickland had left the NYPD in 1979, before most of those acts (including the Brinks robberies and murders) had occurred. In these circumstances, the relevance of Strickland's evidence is questionable. Rule 401, Fed. R.Evid., defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Strickland was not in a position to say anything bearing directly upon the petitioners' guilt or innocence of the crimes charged.

■ Petitioners do not contend that Strickland had direct knowledge of their participation *vel non* in the crimes charged. Rather, petitioners argue that Strickland's description of prior non-violent conduct on the part of Shakur would form the basis for an inference that he did not act violently in the manners charged in the indictment. That testimony would assume particular force in the eyes of the jury, petitioners contend, because Strickland was a law enforcement officer.

Thus petitioners view Strickland's evidence of Shakur's conduct as establishing Shakur's non-violent character, for the purpose of suggesting that with respect to the violent crimes described in the indictment, Shakur acted in a manner consistent with that character, that is to say, he did not participate in them. This approach encounters difficulties under the rules of evidence.

Rule 404(a)(1) permits "[e]vidence of a pertinent trait of character offered by an accused . . ."

Rule 405 provides:

(a) **Reputation or opinion.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) **Specific instances of conduct.** In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

While these rules provide that certain character evidence is admissible, they also serve as limitations on the nature of admissible character evidence and the methods by which character evidence may be proved.

Rule 404(a)(1) requires that the trait of character be "pertinent," a concept which Rule 405(b) further defines as "an essential element of the charge, claim, or defense." The Advisory Committee Notes to the 1972 Proposed Rules distinguish between traits of character that fall within those definitions

and traits that do not. A trait of character is "pertinent" to the case where:

Character may itself be an element of a crime, claim, or defense. A situation of this kind is commonly referred to as "character in issue." Illustrations are: the chastity of the victim under a statute specifying her chastity as an element of the crime of seduction, or the competency of the driver in an action for negligently entrusting a motor vehicle to an incompetent driver.

These examples may be contrasted with cases where character evidence

is susceptible of being used for the purpose of suggesting an inference that the person acted on the occasion in question consistently with his character. This use of character is often described as "circumstantial." Illustrations are: evidence of a violent disposition to prove that the person was the aggressor in an affray, or evidence of honesty in disproof of a charge of theft. This circumstantial use of character evidence raises questions of relevancy as well as questions of allowable methods of proof.

The Advisory Committee Notes go on to observe that: "[i]n most jurisdictions today, the circumstantial use of character is rejected but with important exceptions" (which the Notes then set forth, none of which is germane to the case at bar).

The same limitation applies to Rule 405(b), allowing proof of specific instances of a person's conduct in cases where "character or a trait of character of a person is an essential element of a charge, claim or defense." Weinstein's Treatise on Evidence says of that limitation:

"Evidence of specific acts is permissible to prove character when the character of a person is an essential element of a charge, claim or defense. This permissive use of evidence of specific acts is regularly misinterpreted by trial lawyers. It is allowed only when character itself is an issue under substantive law .... When character is used circumstantially to prove a consequential fact, proof by specific instances is not permitted for practical reasons."

J. Weinstein, M. Berger & J. McLauglin, 2 *Weinstein's Federal Evidence* § 405.05[4] at 405–41–42 (2d ed.1997).

This distinction is illustrated by cases such as *United States v. Wilson*, 586 F.Supp. 1011 (S.D.N.Y.1983) (Weinfeld, J.), *aff'd* 750 F.2d 7 (2d Cir.1984). The defendant was indicted of plotting to assassinate witnesses, prosecutors, and others involved in several federal prosecutions. Prior to trial, the government sought a ruling limiting proof that defendant wished to make with respect to certain covert activities of the United States in which he claimed to have participated during the years in which his alleged felonies took place. Such proof, defendant argued, warranted his belief that federal authorities would not sentence and imprison him, a belief which negated his alleged motive for tampering with witnesses. Defendant also contended that "the evidence would have showed the existence of certain character traits and personal relationships that would have tended to disprove the charges being made against him." 750 F.2d at 9.

Judge Weinfeld held that the defendant would be free at trial "to testify to the fact that his employment with various agencies in the United States intelligence community and to the fact that he was involved in covert operations." 586 F.Supp. at 1017. But defendant would not be allowed to describe the details of those matters or to offer evidence of specific acts on his part, since the rules of evidence "do not permit evidence of specific acts to be admitted to prove character traits as part of an affirmative defense." *Id.* at 1016. Judge Weinfeld cited as support for that proposition *United States v. Davis*, 546 F.2d 583, 592–93 & n. 22 (5th Cir.) (defendant accused of willfully escaping from prison not permitted to introduce "prison records showing . . . a favorable work record . . . and progress toward rehabilitation" as evidence "to negate the likelihood of willful escape"), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977).

In addition, Judge Weinfeld reasoned that detailed proof of such specific instances of conduct would

bring before the jury matters utterly irrelevant to the basic charge in this case and serve to divert the jury's attention from those basic issues. Assuming arguendo that evidence of covert activities, here and abroad, has some minimal probative value in this case, such proof should be excluded on the ground that it would unduly delay the trial.

586 F.Supp. at 1016.

The Second Circuit affirmed, stating at 750 F.2d at 9:

It is a proper exercise of a district court's discretion to exclude evidence that is prejudicial, confusing, or misleading, and to exclude evidence of specific acts intended to demonstrate character traits not at issue. (citations omitted)

For the latter proposition, the Second Circuit in *Wilson* cited *United States v. Benedetto*, 571 F.2d 1246, 1239–50 & n. 5 (2d Cir.1978). *Benedetto* was a prosecution of a government meat inspector who illegally received money in connection with his official duties. The district court permitted four so-called "character witnesses" to testify that defendant had not taken bribes at their respective plants, evidence of specific acts that "was ostensibly designed to prove that Benedetto was a person of good character, unlikely to have taken the alleged bribes." 571 F.2d at 1249. In its opinion affirming the conviction, the Second Circuit criticized both the district court for admitting that evidence and the government's response to it:

Thus, the Government says that it would have been "unfair" to bar it from rebutting this testimony with extrinsic evidence of specific bad acts. However, character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts. Furthermore, while a character witness may be asked on *cross-examination* about "specific instances of conduct," such acts may not be proved by extrinsic evidence of the sort offered here. That the defense improperly attempted to establish defendant's good character by reference to specific good acts did not justify the prosecution's use of testimony concerning bad acts either in its direct case or in rebuttal.

*Id.* at 1249–1250. (citations and footnotes omitted).

More recently, the Second Circuit decided *United States v. Doyle,* 130 F.3d 523 (2d Cir.1997). The defendant was prosecuted for the illegal exportation of fuel pumps to Libya, in violation of federal trade restrictions. Following his conviction, defendant challenged on appeal the refusal of the district court to permit him to subpoena U.S. Army intelligence agents from whom Doyle worked during the period of the alleged conspiracy, and by excluding trial testimony relating to specific actions against Libya which Doyle allegedly took in cooperation with Army intelligence to promote the United States security policy toward Libya. In the words of the court of appeals, the district court held at a preliminary hearing

> that Doyle would be able to testify as to the facts of his life history and employment including any relationship with the U.S. intelligence agencies, but found that testimonial and documentary evidence of specific acts taken by Doyle in cooperation with army intelligence were either not relevant to or inadmissible at this trial.

130 F.3d at 541.

Doyle argued on appeal that proof of those specific acts was "admissible under Fed. R.Evid. 405(b) to go to a direct element of the crime charged—knowledge or intent— because those acts indicate that he would not knowingly act contrary to American policy toward Libya." The Second Circuit, affirming the conviction, held that "evidence of specific acts is not admissible under Fed. R.Evid. 405(b) when character is not an element of the crimes charged." *Id.* at 542. After citing its prior opinion in *Wilson* and the passage from Weinstein's Treatise on Evidence that I have quoted *infra,* the Second Circuit concluded in *Doyle:*

> Doyle's argument that character was an element of these charges because "he was charged ... with intending to violate a national security policy of the United States[,]" distorts Rule 405 beyond recognition. As the trial court recognized, if specific good deeds could be introduced to disprove knowledge or intention, which are elements of most crimes, the exception of

Rule 405(b) would swallow the general rule of 405(a) that proof of specific acts is not allowed. *Id.*

The government also cites *United States v. Beverly,* 913 F.2d 337 (7th Cir.1990). The defendant was convicted with others of participating in a narcotics operation which involved, among other places, the sale of cocaine at Somons Lounge, a property owned by defendant. The district court refused to permit a defense witness, one Dr. Layne, to testify that he had never seen defendant buy or sell cocaine outside of Somons Lounge. The Seventh Circuit affirmed that ruling, noting that the proposed testimony "would have revealed nothing about Mr. Beverly's activities at Somons," and that while defendant "undoubtedly could have called any number of additional witnesses to testify that they never had purchased cocaine from him," such proof "of an assertion by a negative is inadmissible." 913 F.2d at 353 (footnote omitted). The court of appeals also dealt with defendant's claim that Layne's testimony was admissible as character evidence, stating on that point:

> Beverly's character was not an essential element in this case; character evidence may not be proved by specific instances of conduct, such as Mr. Beverly sought to introduce through Dr. Layne, unless character of a person is "an essential element of a charge, claim or defense." Fed. R.Evid. 405(b).

913 F.2d 337 at n. 23.

In support of the admissibility of the substance of the Strickland declarations, petitioners rely upon *United States v. Sheffield,* 992 F.2d 1164 (11th Cir.1993), in which defendant was convicted of embezzling United States Air Force property by ordering his subordinates at an air force base to use government time and materials to manufacture fishing equipment for his personal use. The district court excluded defendant's proffered evidence "pertaining to the custom of using base facilities to produce authorized retirement gifts for high-ranking employees." 992 F.2d at 1169. The district court concluded that the evidence was irrelevant because "the base practice of making authorized retirement gifts had no bearing on whether Mr.

Sheffield ordered fishing lures made for his own benefit." *Id.* at 1170. The Eleventh Circuit disagreed and reversed the conviction, reasoning that "[e]vidence of the gift-making custom was relevant to Mr. Sheffield's state of mind when he ordered the production of fishing lure molds," and because it had "a tendency to make more probable Mr. Sheffield's claim that his request for fishing lure molds was part of a legitimate base project" (citing Fed.R.Evid. 401). As the Eleventh Circuit noted:

> Without this evidence of the gift-making custom, production of fishing lure molds on a U.S. Air Force base must have seemed to the jury like the oddball project of a renegade fisherman.

*Id.*

*Sheffield* is of no assistance to the petitioners at bar. The evidence of the gift-making custom was improperly excluded, the Eleventh Circuit held, because it deprived defendant of support for his contention that he had no illegal intent when he ordered production of the molds in question. In the case at bar, petitioners were accused of murder, robbery, and other acts of violence, which no practice or custom (even if one was suggested) could justify.

Given these authorities, it is plain enough that if Shakur and Buck had been fully aware of Strickland's declarations and impressions at the time of trial, and had sought to prove them by calling Strickland as a witness, I would have excluded the evidence. Strickland was not in a position to offer anything more probative than circumstantial evidence of character, which under the rules of evidence and controlling appellate authority was not admissible. Shakur's character did not form an essential element of the government's charges against him; nor may Shakur's character be regarded as an essential element of his defense, without permitting Rule 405(b) to swallow up Rule 405(a) in the manner prohibited by the Second Circuit in *Doyle.* Shakur could have testified generally as to his beliefs and conduct, as the trial courts in *Wilson* and *Doyle* indicated those defendants could do; but Shakur elected not to take the stand.

In addition, Strickland's descriptions of Shakur's conduct at specific events not referred to in the indictment would have the potential of confusing the jury and distracting its attention from the basic issues in the case. The evidence would accordingly fail to pass muster under Rule 403, Fed.R.Evid.

Accordingly, petitioners' *Brady* claims fail on this ground as well, since undisclosed evidence cannot form a basis for post-trial relief if that evidence could not have been admitted at the trial in any event.

 The second *Brady* contention arising out of the Strickland declarations relates to Rison's comments about the M–16 rifle, which Strickland interpreted as an acknowledgment by Rison that he stole the rifle from the Army base at Fort Bragg.

The admissibility at trial of Strickland's evidence on that point is also problematic. It is clear from the trial transcript, quoted *supra,* that Shakur's counsel knew from other sources—apparently including the Reverend Mr. Chavis—that Rison might have stolen the M–16. Counsel confronted Rison with that subject during cross-examination. While the government did not object at the time, counsel's inquiry about this specific instance of Rison's conduct, theft of a rifle, implicates Rule 608(b), Fed.R.Evid., which limits such inquiries on cross-examination to conduct "if probative of truthfulness or untruthfulness." The 1972 Advisory Committee Notes observe that "the possibilities of abuse are substantial" when counsel cross-examines a witness about "[p]articular instances of conduct, though not the subject of criminal conviction," and stress that "[c]onsequently safeguards are erected in the form of specific requirements that the instances inquired into be probative of truthfulness or its opposite and not remote in time." It is generally held that crimes of theft are not probative of truthfulness. *See* J. Weinstein, M. Berger, J. McLauglin, 4 *Weinstein's Federal Evidence.* ¶ 608.12[4][b] at 608.34–34.5 (2d ed. 1997) ("Some behavior, though illegal or immoral, may not be relevant to truthfulness. For example, robbery ... doe[es] not directly relate to truthfulness ...").

But even if Rison's suggested theft of a rifle should be regarded as probative of his

truthfulness as a trial witness and sufficiently close in time to the events he described, that would do no more than entitle Shakur's counsel to inquire into the subject on cross-examination, which counsel did. Strickland's declarations on the subject, if offered by the defense at trial, would be viewed as an effort to prove Rison's prior conduct by "extrinsic evidence," an exercise that Rule 608(b) explicitly forbids.

### (iii). *Materiality*

 Even if (contrary to my conclusions) the prosecution team had knowledge, actual or imputed, of the substance of the Strickland declarations, and (also contrary to my conclusions) Strickland's testimony would have been admissible at trial under the rules of evidence, petitioners are not entitled to habeas relief unless the evidence that the government failed to disclose was material in the sense defined by *Kyles v. Whitley*, 514 U.S. at 433, 115 S.Ct. 1555. Evidence is "material" in the *Brady* context "if there was a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (citation omitted).

On this aspect of the case, these petitions fail utterly. Strickland's declarations do not pretend to address directly whether or not petitioners committed the acts charged against them. That is not surprising, since Strickland has no knowledge of those matters. Rison, according to his trial testimony, had a great deal of knowledge, and one can only infer from the verdict that the jurors credited that testimony, which was sufficient in law to convict both petitioners, even without independent corroboration. In point of fact, the government offered significant corroborating evidence. I need not recount it in detail. Petitioners argue that the corroborating evidence lacked substance. Defense counsel made that argument at trial. The argument was not persuasive then and comes too late now. Given the government's trial evidence, it is impossible to conclude that if the jury had heard Strickland's testimony that at other times and in other places he did

not observe Shakur commit criminal acts— which is all it really comes down to—it is reasonably probable that the jury would have acquitted Shakur and Buck.

There remains the issue of Rison's credibility in the jurors' eyes, as it might have been affected by Strickland's account of the M–16 rifle remarks. I acknowledge the centrality of Rison's importance to the government's case; no one could reasonably deny it. Petitioners' argument on this aspect of the case comes down to the proposition that Rison lied on cross-examination when he denied stealing the M–16. For the purposes of this argument, I will assume that this testimony was false.[8] The significance of this assumed lie suffers in comparison with Rison's testimony, corroborated by FBI agents, that after he decided to cooperate with the government, Rison led agents to a remote location in Georgia where he had hidden the weapon, which Rison testified he had used during the June 2, 1981 Bronx armored car robbery and murder. Rison's knowledge of the hiding place of the rifle *after* using it to commit one of the charged offenses is infinitely more probative of the issues at trial than the manner in which Rison acquired the rifle *before* commission of the crime.

To be sure, Rison's assumed falsehood on the latter point would have reflected unfavorably on his credibility; but trial judges routinely instruct jurors that if they conclude that a witness has testified falsely upon a particular point, they may reject the testimony of that witness entirely, or accept such parts of it as they find credible or corroborated by other evidence in the record. Rison's knowledge of where the M–16 was hidden is in itself striking corroboration of his account, and there is much else of a corroborative nature in the record.

It is also pertinent to note that while Rison's assumed falsehood about how he obtained the rifle could, conceptually at least, impeach all his trial testimony, it would at the very most have been cumulative, in a case where the defense had a great deal of material with which to impeach Rison—including a number of murders—and did so at

---

8. The government denies that Rison stole the M–16, and offers an affidavit from an FBI case agent in support of its view. I discuss the matter further under Point B, *supra*.

considerable length. The Second Circuit has made it plain that even where the government fails to disclose evidence which clearly falls within *Brady*, a conviction will not be overturned if the non-disclosed evidence would have done no more than furnish an additional and cumulative ground for impeaching the witness. In those circumstances the court of appeals regards the non-disclosed evidence as not material, since even without it the jury "had a fair opportunity to evaluate the witness's credibility." *See United States v. Gambino*, 59 F.3d 353, 366 (2d Cir.1995), *cert. denied*, 517 U.S. 1187, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993), *cert. denied*, 511 U.S. 1070, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994).

In the circumstances of this case, I am unable to conclude that if the jury believed Rison lied when he denied stealing the M–16 rifle, it is reasonably probable that it would have acquitted Shakur and Buck on these charges.

Accordingly, petitioners' contentions, based upon the Strickland declarations, that the government violated its *Brady* obligations of disclosure fail. They fail because (1) the prosecution team had no knowledge, actual or imputed, of Strickland or his undercover reports, and so, not possessing that information, cannot be faulted for not disclosing it; (2) the substance of Strickland's declarations, even if known to the defense, would not have been admissible at trial; and (3) the substance of the Strickland declarations was not material for purposes of *Brady* analysis. Any one of these factors would be fatal to these petitions; all three are present.[9]

### B. *Perjury*

Petitioners also contend that they are entitled to a new trial under Rule 33, Fed. R. Crim.P., because Rison's alleged perjury with respect to the M–16 rifle constitutes newly discovered evidence of sufficient significance to invalidate their convictions.

The first obstacle that petitioners encounter is that perjury of a government witness cannot form the basis of a new trial under Rule 33 if the perjurious nature of the testimony in question was known to the defense at the time of trial or discoverable by due diligence. *See Harris v. United States*, 9 F.Supp.2d 246, 253–57 (S.D.N.Y.1998) (collecting Supreme Court and Second Circuit cases). In the case at bar, Rison's possible perjury with respect to his acquisition of the M–16 rifle arose out of circumstances known to Shakur's defense team at the time of trial. That is apparent from the thrust of counsel's cross-examination. Armed with ammunition supplied by Rev. Chavis or whatever other source, counsel put it to Rison directly that he had stolen the rifle, and had acknowledged the theft to others. Rison denied counsel's assertions. While Strickland's interpretation of what Rison said to him was consistent with counsel's accusation, the accusation itself was not founded upon evidence newly discovered after trial.

At least that is so, unless Strickland's status as a police officer endows his testimony with so enhanced a resonance that it becomes "newly discovered" within Rule 33. If one takes that view of the case, it falls within the general principles articulated by the Second Circuit in *United States v. Torres*, 128 F.3d 38, 48–49 (2d Cir.1997):

> When a motion for a new trial rests on newly discovered evidence, the defendants must show: (1) that, with due diligence they could not have discovered the evi-

---

9. I deny petitioners' request for discovery into these issues. Petitioners, alleging that the government violated *Brady*, bear the burden of showing that the government possessed and did not disclose specific material evidence. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 59, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (for *Brady* purposes, "[u]nless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final.") (footnote omitted). As explicated in the text of this opin-

ion, not only have petitioners failed to make those showings, the circumstances point clearly in the opposite direction. In an effort to remedy these failures, petitioners wish to embark upon a broad fishing expedition, in the hope that something might turn up. I conclude that they are not entitled to do so.

Moreover, even if discovery furnished a basis for imputing knowledge of Strickland to the prosecution, the elements of admissibility and materiality are not present.

dence during trial, (2) that the evidence is material, and (3) that the evidence is non-cumulative.

Where the newly discovered evidence is the existence of allegedly perjured testimony, the defendant must first demonstrate that perjury was in fact committed. And if the prosecution was unaware of the perjury, the defendant must also show that the jury probably would have acquitted in the absence of the false testimony. If instead the prosecution knew or should have known about the perjury, then the conviction will be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Thus, whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was unaware of the perjury (internal quotation marks and citations omitted).

■■■ Applying these principles to the case at bar, petitioners must first demonstrate that Rison in fact committed perjury when on cross-examination he denied stealing the rifle. Do the Strickland declarations, if one accepts their assertions as true, demonstrate that perjury? In his first declaration, Strickland says that Rison demonstrated the rifle and "told me he had got it off the base at Fort Bragg"; the first declaration does not ascribe to Rison the word "steal." Strickland's second declaration expands on that subject. He acknowledges that Rison "may not have used the word 'steal,'" but "from the way that Mr. Rison spoke I understood him to say that it was he who took he rifle off the base at Fort Bragg and that he had actually stolen it." Specifically, Strickland reasoned that because Rison "did not say he had gotten [the rifle] from anyone else who had taken it from the base at Fort Bragg," and did not describe "anyone else involved in his getting the rifle I understood that what he was saying was that he had actually stolen the rifle which was at Fort Bragg."

Perhaps; but perhaps not. Strickland's declarations fall well short of portraying Rison as a self-confessed rifle thief. Strickland may simply have placed the wrong interpretation on what Rison told him. The government contends that he did,[10] and offers in support of that contention the affidavit of FBI agent Daniel B. Caylor. Caylor says that during 1986 and 1987, he participated with others in several debriefings of Rison. Affidavit, ¶ 5. At one of those sessions "Rison was asked about how he came into possession of the M–16 rifle which he had used during the commission of the Bronx Brinks robbery charged in both Shakur's and Buck's indictments." *Id.* Caylor recounts the substance of Rison's response at ¶¶ 6–8:

6. As best I can recall, Rison indicated to us that sometime in the 1970's (prior to the first predicate act of racketeering charged in Shakur's indictment), he was in Wilmington, North Carolina. While he was there, Rison said either that he met with one individual or two to three individuals who showed him a crate containing several M–16 rifles. The individual(s) who showed Rison the rifles indicated to him that they had been stolen from a military base. Rison purchased one of the rifles from this (these) individual(s). Rison said either that he gave the individual(s) cash or another weapon in exchange.

7. At no time did Tyrone Rison or anyone else ever tell me that Rison himself had stolen the M–16 rifle in question.

8. Fort Bragg, a United States military installation, is located in Fayettville, North Carolina, which is between one and two hours by car from Wilmington, North Carolina

On this record, it is doubtful that petitioners have made the threshold showing "that perjury was in fact committed." *Torres,* 128 F.3d at 48. But I need not pursue the question further, because it is apparent in any event that petitioners are not entitled to habeas relief on this ground.

*Torres* goes on to instruct that "if the prosecution was unaware of the perjury, the

---

**10.** The government does not accept that Strickland accurately quotes Rison, or that Rison's quoted declarations would have been admissible in evidence. The government makes the contention discussed in text in the alternative.

defendant must also show that the jury probably would have acquitted in the absence of the false testimony." 128 F.3d at 48. For the reasons set forth in the closely related *Brady* consideration of the prosecution's knowledge of Strickland and his declarations, neither actual nor imputed knowledge may be ascribed to the government. And, as in the *Brady* context, I cannot conclude that "the jury probably would have acquitted" in the absence of Rison's denial that he stole the rifle (assumed to be perjurious for the purpose of this analysis).

If, contrary to my conclusion, the government "knew or should have known about the perjury," the conviction would be set aside only "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Torres,* 128 F.3d at 49. In the totality of the circumstances of this case, I do not think that petitioners have made even that less demanding showing.

Petitioners make other arguments in support of habeas relief. I have considered them all, and also find those not discussed in this Opinion to be without merit.[11]

I hold that the petitions must be dismissed, and that neither discovery nor an evidentiary hearing are necessary or appropriate.

The Clerk of the Court is directed to dismiss the petitions with prejudice.

It is SO ORDERED.

---

11. The main brief for Buck at 10–13 contains a suggestion that Rison perjured himself before the grand jury. No specifics about the suggested perjury are given. Presumably the government made Rison's grand jury testimony available to defense counsel at trial under 18 U.S.C. § 3500, so that possible perjury known to the defense at that time could have been explored (as with Rison's acquisition of the M–16 rifle). So vague and conclusory a suggestion of grand jury perjury is not sufficient to justify further inquiry.